[No. C061328. Third Dist. Dec. 30, 2010.]

CALIFORNIA SCHOOL BOARDS ASSOCIATION et al., Plaintiffs and Appellants, v.
STATE BOARD OF EDUCATION et al., Defendants and Respondents;
CALIFORNIA CHARTER SCHOOLS ASSOCIATION, Intervener and Appellant.

### COUNSEL

Greenberg Traurig, Carol Leacox Livingston; Sue Ann Salmon Evans and Dannis Woliver Kelley for Plaintiffs and Appellants.

Middleton Young & Minney, Paul C. Minney; Procopio Cory Hargreaves & Savitch and Gregory Victor Moser for Intervener and Appellant.

Todd M. Smith for Defendants and Respondents.

### OPINION

**CANTIL-SAKAUYE, J.**—In 2000, the voters of this state approved Proposition 39, which, among other things, amended Education Code section 47614[1] to require public school facilities to be shared fairly among all public school pupils, including those in charter schools. (Prop. 39, as approved by voters, Gen. Elec. (Nov. 7, 2000); § 47614, subd. (a).) This case considers the validity of various regulations adopted by the State Board of Education (State Board) pertaining to a public school district's sharing of its facilities with charter schools. We conclude the challenged regulations are valid. We shall affirm the portion of the trial court's judgment that upheld the majority of the challenged regulations and reverse the portion of the judgment that set aside several of the regulations.

---

[1] Hereafter, undesignated statutory references are to the Education Code.

## BACKGROUND

The Legislature adopted the Charter Schools Act of 1992 (§ 47600 et seq.; hereafter Charter Schools Act) to "provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure . . . ." (§ 47601.) The Legislature intended charter schools to be a means of (1) improving student learning; (2) increasing learning opportunities, especially for low-achieving students; (3) encouraging the use of different and innovative teaching methods; (4) creating new professional opportunities for teachers; (5) offering parents and students more choices within the public school system; and (6) giving schools a way to change from a rule-based to a performance-based accountability system. (*Id.*, subds. (a)–(f); *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1130–1131 [89 Cal.Rptr.2d 745].) In 1998, the Legislature added a seventh goal to this list: to "[p]rovide vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601, subd. (g), added by Stats. 1998, ch. 34, § 1, p. 193.)

A charter school may be created a number of different ways under the Charter Schools Act. A petition to establish a charter school may be granted by a school district's governing board after the petition has been circulated and signed either by a number of parents or legal guardians of students that is equivalent to at least 50 percent of the number of students that is estimated will be enrolled in the charter school in the first year or a number of teachers that is equivalent to at least 50 percent of the number of teachers the charter school estimates will be employed at the school in the first year. (§ 47605, subds. (a)(1) & (b).) A petition to convert certain existing public schools to charter schools may be granted by a school district's governing board after the petition has been circulated and signed by not less than 50 percent of the permanent status teachers currently employed at the public school to be converted. (*Id.*, subds. (a)(2) & (b).) If the governing board of a school district denies a petition for a charter school, the petition may be submitted to and granted by the applicable county board of education or the State Board. (*Id.*, subd. (j).) A petition may also be submitted directly to a county board of education or the State Board. (§§ 47605.5, 47605.6, 47605.8.)

In addition to charter schools formed under the Charter Schools Act, parents of pupils in certain underachieving schools may apply directly to the State Board to allow them to establish a charter school "at the existing schoolsite." (§§ 52055.5, subd. (b)(3)(B), 52055.55, subd. (b)(3), 52055.650, subd. (h)(2)(B).)

Prior to the adoption of Proposition 39, former section 47614 provided: "A school district in which a charter school operates shall permit a charter school

to use, at no charge, facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes provided the charter school shall be responsible for reasonable maintenance of those facilities." (Stats. 1998, ch. 34, § 15, p. 202.)

Proposition 39 changed this limited obligation of a school district to provide facilities to a charter school. The voters of California expressed the intent "that public school facilities should be *shared* fairly among all public school pupils, including those in charter schools." (§ 47614, subd. (a), italics added.) Post-Proposition 39, section 47614, subdivision (b), now provides: "Each school district *shall make available, to each charter school* operating in the school district, *facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district. Facilities provided shall be contiguous, furnished, and equipped,* and shall remain the property of the school district. *The school district shall make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate, and shall not move the charter school unnecessarily.*" (Italics added.)

Section 47614 sets forth certain parameters for the school district and the responsibilities of the charter schools. Section 47614 allows a school district providing facilities to a charter school to "charge the charter school a pro rata share (based on the ratio of space allocated by the school district to the charter school divided by the total space of the district) of those school district facilities costs which the school district pays for with unrestricted general fund revenues. The charter school shall not be otherwise charged for use of the facilities. No school district shall be required to use unrestricted general fund revenues to rent, buy, or lease facilities for charter school students." (§ 47614, subd. (b)(1).)

Section 47614 requires each charter school desiring facilities from a school district to each year "provide the school district with a reasonable projection of the charter school's average daily classroom attendance by in-district students for the following year. The district shall allocate facilities to the charter school for that following year based upon this projection. If the charter school, during that following year, generates less average daily classroom attendance by in-district students than it projected, the charter school shall reimburse the district for the over-allocated space at rates to be set by the State Board of Education." (§ 47614, subd. (b)(2).) A school district may deny facilities requests based upon projections of fewer than 80 units of average daily classroom attendance for the year. (*Id.*, subd. (b)(4).)

Critical to this case, section 47614 also provides: "The State Department of Education shall propose, and the State Board of Education *may adopt,*

*regulations implementing this subdivision, including but not limited to* defining the terms 'average daily classroom attendance,' 'conditions reasonably equivalent,' 'in-district students,' 'facilities costs,' as well as defining the procedures and establishing timelines for the request for, reimbursement for, and provision of, facilities." (§ 47614, subd. (b)(6), italics added.)

The State Board's rulemaking authority in section 47614 complements its general authority in section 33031 to "adopt rules and regulations not inconsistent with the laws of this state . . . (c) for the government of the day and evening elementary schools, the day and evening secondary schools, and the technical and vocational schools of the state, and (d) for the government of other schools, excepting the University of California, the California State University, and the California Community Colleges, as may receive in whole or in part financial support from the state."

In 2002, the State Board adopted regulations to implement the provisions of section 47614. (Cal. Code Regs., tit. 5, § 11969.1 et seq.)[2] Several years later, the State Department of Education was directed to review the existing regulations with the assistance of a workgroup broadly representative of the educational community, including charter schools, school administrators, school boards, and teachers. The objective was to identify amendments that would update, clarify, or enhance the existing regulations based on experience, as well as several published appellate court decisions. Using workgroup input and other sources of information, regulatory amendments were proposed by the State Department of Education to the State Board. In 2008, the State Board adopted the new regulations.

The California School Boards Association, the Education Legal Alliance, the Association of California School Administrators, and the California Association of School Business Officials (together the School District Associations) filed a petition for writ of mandate and complaint for injunctive and declaratory relief against the State Board, Jack O'Connell in his capacity as the California State Superintendent of Public Instruction, and the State Department of Education (together the State defendants) seeking to vacate and set aside 15 of the provisions of the regulations. The trial court granted the California Charter Schools Association (the Charter Association) leave to intervene.

The trial court issued a ruling after hearing in which it upheld 10 of the challenged regulations, but found five of the challenged regulations contained invalid provisions. The trial court issued a judgment directing the issuance of

---

[2] Further references to Regulations, sections 11969.1 through 11969.9 are references to these regulations.

a peremptory writ of mandamus compelling the State defendants to vacate the regulations contained in Regulations, section 11969.3, subdivision (d)(1), (2)(A), (B), (C), and (D).

The Charter Association filed an appeal from the portion of the judgment and peremptory writ that required the State defendants to vacate the five specified regulations as invalid. The Charter Association claims all the regulations are valid.

The School District Associations appeal the portion of the judgment and decision that upheld the challenged regulations. The School District Associations claim the trial court erred in upholding six of the 10 regulations they challenged at the trial court level. They assert the regulations are invalid.

## DISCUSSION

## I.

## Standard of Review

There are two categories of administrative rules: quasi-legislative rules and interpretive rules. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) The regulations adopted by the State Board here are quasi-legislative rules to which we apply a narrow scope of review.[3]

As stated by the California Supreme Court: "It is a 'black letter' proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind— quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at

---

[3] In the other class of administrative rules, those interpreting a statute, the agency is not exercising any delegated lawmaking power, but is providing its view of a statute's legal meaning and effect. (*Yamaha, supra*, 19 Cal.4th at p. 11.) A different standard of review is applicable to interpretive rules (*id.* at pp. 12–13), which we need not detail here because it is inapplicable.

an end." (*Yamaha, supra*, 19 Cal.4th at pp. 10–11.) A court's function is to inquire into the regulation's legality, not its wisdom. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1040 [12 Cal.Rptr.3d 343, 88 P.3d 71] (*State Farm*).)

" ' "[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . ." [Citations.] The [agency] is authorized to "fill up the details" of the statutory scheme. [Citation.]' " (*Marshall v. McMahon* (1993) 17 Cal.App.4th 1841, 1848 [22 Cal.Rptr.2d 220], quoting *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328]; accord, *Mineral Associations Coalition v. State Mining & Geology Bd.* (2006) 138 Cal.App.4th 574, 589 [41 Cal.Rptr.3d 544] (*Mineral Associations*); *Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 981 [8 Cal.Rptr.2d 565].)

However, an agency does not have discretion to promulgate regulations that are inconsistent with the governing statute, alter or amend the statute, or enlarge its scope. (*Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 974 [36 Cal.Rptr.3d 627]; *People ex rel. Dept. of Alcoholic Beverage Control v. Miller Brewing Co.* (2002) 104 Cal.App.4th 1189, 1198–1199 [128 Cal.Rptr.2d 861]; *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 872–873 [76 Cal.Rptr.2d 841]; accord, Gov. Code, §§ 11342.1, 11342.2.)

Where regulations are void because of inconsistency or conflict with the governing statute, a court has a duty to strike them down. (*Littoral Development Co. v. San Francisco Bay Conservation etc. Com.* (1994) 24 Cal.App.4th 1050, 1058 [29 Cal.Rptr.2d 518].) "In the end, '[t]he court, not the agency, has "final responsibility for the interpretation of the law" under which the regulation was issued.' " (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110 [126 Cal.Rptr.2d 441], fn. omitted.) We must conduct an independent examination to determine whether the agency " 'reasonably interpreted the legislative mandate' " in enacting the regulation. (*State Farm, supra*, 32 Cal.4th at p. 1040.) "[T]he standard governing our resolution of the issue is one of 'respectful nondeference." (*Mineral Associations, supra*, 138 Cal.App.4th at p. 583; accord, *Yamaha, supra*, 19 Cal.4th at p. 11, fn. 4.)

We keep in mind that "the burden is on the party challenging a regulation to show its invalidity." (*Mineral Associations, supra*, 138 Cal.App.4th at p. 589; accord, *Geftakys v. State Personnel Board* (1982) 138 Cal.App.3d 844, 867 [188 Cal.Rptr. 305].)

## II.

## The School District Associations' Challenge on Appeal to the 2008 Regulations

The School District Associations argue the trial court erred in upholding the validity of six of the State Board's regulations: (1) Regulations, section 11969.2, subdivision (d); (2) *id.*, section 11969.3, subdivision (a)(1); (3) *id.*, section 11969.2, subdivision (e); (4) *id.*, section 11969.7, subdivision (f); (5) *id.*, section 11969.9, subdivision (c)(1)(C); and (6) *id.*, section 11969.9, subdivision (k)(3). We consider each of the regulations in turn.

1. *Regulations, Section 11969.2, Subdivision (d) "Contiguous"*
 *(Regulations, section 11969.2(d))*

Regulations, section 11969.2(d) was amended in 2008 to read as follows (new language is underscored): "(d) Contiguous. As used in Education Code section 47614(b), facilities are 'contiguous' if they are contained on the school site or immediately adjacent to the school site. If the in-district average daily classroom attendance of the charter school cannot be accommodated on any single school district school site, contiguous facilities also includes facilities located at more than one site, provided that the school district shall minimize the number of sites assigned and shall consider student safety. In evaluating and accommodating a charter school's request for facilities pursuant to Education Code section 47614, the charter school's in-district students must be given the same consideration as students in the district-run schools, subject to the requirement that the facilities provided to the charter school must be contiguous. If a school district's preliminary proposal or final notification presented pursuant to subdivisions (f) or (h) of section 11969.9 does not accommodate a charter school at a single school site, the district's governing board must first make a finding that the charter school could not be accommodated at a single site and adopt a written statement of reasons explaining the finding."

At the trial court level, the School District Associations attacked the new portion of this regulatory language as (1) inconsistent with section 47614 and *Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986 [30 Cal.Rptr.3d 648] (*Ridgecrest*), (2) as lacking evidence of necessity in the record, and (3) as being vague. The trial court rejected the School District Associations' claims.

Changing tack, the School District Associations no longer pursue these claims on appeal. The School District Associations now challenge the original language of the regulation adopted in 2002, complaining the regulation

(1) defines the term "contiguous" to mean a single or same school site contrary to the plain meaning of the term and (2) requires charter school students to be accommodated on the same site without regard to grade level, which they allege is inconsistent with the requirement of section 47614, subdivision (b) that facilities be provided in "conditions reasonably equivalent." The School District Associations argue, apparently as part of this last claim, the sole exception recognized by the regulation for not providing a single site—that there are too many charter school students (in-district average daily classroom attendance) to be accommodated at a single site—is insufficient to allow consideration of grade level factors relevant to providing reasonably equivalent facilities. The School District Associations also argue the regulation makes the "contiguous" provision dominant over the "conditions reasonably equivalent" provision of section 47614. In their reply brief, the School District Associations propose "contiguous" as used in section 47614 means "attendance areas defining the neighborhoods served by the schools" "touch, are adjacent to, next to, and share some portion of a common boundary."[4] We find no merit in these claims.

■ To begin with, the State Board has clear authority to define the term "contiguous," which is used without statutory definition in section 47614. Section 47614, subdivision (b)(6), expressly authorizes the State Board to adopt "regulations implementing this subdivision, including but not limited to defining the terms . . . ."

■ The State Board adopted a definition of "contiguous" in Regulations, section 11969.2(d) that "facilities are 'contiguous' if they are contained on the school site or immediately adjacent to the school site." In addition, "[i]f the in-district average daily classroom attendance of the charter school cannot be accommodated on any single school district school site, contiguous facilities also includes facilities located at more than one site . . . ." (*Ibid.*) Patently, the State Board has not adopted a regulation that defines "contiguous" as solely a single site as the School District Associations claim.

■ The State Board has adopted a definition of "contiguous" that is consistent with the plain and ordinary meaning of the term as recognized by

---

[4] As the issue presented involves purely a legal question of the regulation's consistency with the statute and no factual determinations from the record, we consider the School District Associations' new legal arguments (see *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Yeap v. Leake* (1997) 60 Cal.App.4th 591, 599, fn. 6 [70 Cal.Rptr.2d 680]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780]), although we disapprove of the practice of piecemeal litigation of legal objections to a regulation and warn the School District Associations that it is unwise to depend on us to always exercise our discretion in this manner. (See *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 658–659 [60 Cal.Rptr.2d 677]; see also *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758].)

the court in *Ridgecrest, supra*, 130 Cal.App.4th 986. " 'Contiguous' means 'touching along all or most of one side' or, more generally, 'near, next, or adjacent [to].' (Webster's New World Dict. (2d college ed. 1982) p. 307.) The requirement that charter schools be provided with 'contiguous' facilities presumably means the facilities must be contiguous *to one another*, i.e., located at or near the same site; otherwise, there would not appear to be any reason for including the term in the statute." (*Id.* at p. 1001.)[5]

The definition of "contiguous" in Regulations, section 11969.2(d) tracks this common understanding of the term. Facilities are contiguous "if they are contained on the school site or immediately adjacent to the school site." (Regs., § 11969.2(d).) Indeed, the regulatory definition goes beyond this common understanding to also include multiple sites as contiguous where "the in-district average daily classroom attendance of the charter school cannot be accommodated on any single school district school site." (Regs., § 11969.2(d).)

Nevertheless, the School District Associations argue the definition of "contiguous" in Regulations, section 11969.2(d), which they assert requires a school district to accommodate charter school students on the same site without regard to grade level, prevents them from complying with the requirement of section 47614, subdivision (b) that facilities be provided in "conditions reasonably equivalent." The School District Associations argue the sole exception recognized by the regulation for not providing a single site—that there are too many charter school students to be accommodated at a single site—is insufficient to allow consideration of grade level factors relevant to providing reasonably equivalent facilities.

In explanation of these points, the School District Associations point out that traditional schools are typically organized into elementary schools (with grades K through 5 or K through 6), middle schools (with grades 6 through 8, 7 through 8, or 7 through 9), and high schools (with grades 9 through 12 or 10 through 12). Elementary schools have smaller desks, bathrooms and other furnishings. Middle schools and high schools have not only larger furnishings, they have additional classroom space for age-appropriate educational programs such as science, music, and vocational training. Playgrounds and athletic facilities differ in size and type between the school campuses. For charter schools offering K through 8 or K through 12 programs, the School District Associations claim the regulation forces school districts to make "a

---

[5] As recognized by *Ridgecrest, supra*, 130 Cal.App.4th at page 1001, it is the facilities provided that must be contiguous to one another under section 47614, not the attendance areas or neighborhoods of the schools. We, therefore, reject the proposed definition of "contiguous" offered by the School District Associations, which would define "contiguous" as the "attendance areas defining the neighborhoods served by the schools."

Hobson's choice." The choice being locating the charter students at an elementary school, depriving the middle and high school charter students of their age-appropriate specialized classrooms and athletic facilities, as well as exposing the district's traditional elementary school students to the safety concerns presented by the presence of the charter school's older students, or locating the charter students at a middle school or high school to the disadvantage of the charter's elementary students. We are unpersuaded.

■ Again, the definition of "contiguous" in Regulations, section 11969.2(d) does not absolutely require a single site. Thus, a school district may be able to eliminate or reduce some of these identified difficulties by providing "adjacent" facilities. And where there are too many charter students to be accommodated at a single site, a district may offer multiple sites based on grade level and still meet the contiguity requirement. Nevertheless, to the extent the number of charter school students does not exceed what can be accommodated at a single district facility and where there are no adjacent facilities available, a difficult situation may indeed be presented. However, the difficulty is not a result of the regulation, but of the statute. Section 47614 requires each school district to "share[d] fairly" (§ 47614, subd. (a)) public school facilities with charter schools by making facilities available to each charter school that are sufficient to accommodate all the charter school students "in conditions *reasonably* equivalent" to those they would be in if they attended the district's traditional schools (*id.*, subd. (b), italics added) *and* that such facilities are "contiguous." (*Ibid.*) Regulations, section 11969.2(d) does not make the "contiguous" provision dominant over the "conditions reasonably equivalent" provision of section 47614. It recognizes the statute requires both.

We agree with the court in *Ridgecrest, supra,* 130 Cal.App.4th 986, that "[t]here is, plainly, some tension between the 'shared fairly' and 'reasonably equivalent' requirements in section 47614 on the one hand, and the 'contiguous' requirement on the other. The first two suppose a balancing of all the factors—educational, logistical, financial, legal, and practical—that ordinarily go into deciding how to assign students among the various schools within a district (giving equal consideration to the 'district' and charter school students). The third requirement, contiguity, supposes that all charter school students must first be assigned to the same site (assuming one exists large enough to house them all) before any consideration may be given to the other factors. These two extremes correspond roughly to the positions staked out by the parties in this case. We believe the answer lies somewhere in between, albeit toward the contiguity end of the scale. That is, at the risk of seeming to oversimplify a difficult and complex process, we think it must at least *begin* with the assumption that all charter school students will be assigned to a single site, and attempt from there to adjust the other factors to accommodate this goal." (*Id.* at p. 1002.)

Contrary to the assertion of the School District Associations, the definition of "contiguous" in Regulations, section 11969.2(d) does not prevent the consideration of grade level factors relevant to providing reasonably equivalent facilities and there is no reason to conclude on this facial challenge to the regulation that it is impossible or illogical for a district to provide "*reasonably* equivalent" (§ 47614, subd. (b), italics added) facilities at a single site for a charter school with a broader range of grade levels than the traditional schools in the district.

The term "reasonably equivalent" is broad enough to encompass many situations. For example, if the number of students in a charter school with a K through 8 or K through 12 educational program can be accommodated on an elementary school site within the school district, the district may bring appropriate furniture and other middle school and/or high school appropriate equipment onto the elementary school site for the older charter students' use. A decision may be made that such students can reasonably put up with the smaller restroom or other fixed elementary school facilities.[6] School schedules could be staggered to minimize any safety concerns posed by the presence of the older students on the elementary campus. The accommodation options are many; thus, the regulation does not preclude a district from considering grade level factors in providing "*reasonably* equivalent" and "contiguous" facilities at a single site.

■ Finally, Regulations, section 11969.2(d) recognizes there may be circumstances where a district concludes it simply cannot provide reasonably equivalent facilities to the charter school at a single site. Regulations, section 11969.2(d) provides that, "[i]f a school district's preliminary proposal or final notification presented pursuant to subdivisions (f) or (h) of Regulations, section 11969.9 does not accommodate a charter school at a single school site, the district's governing board must first make a finding that the charter school could not be accommodated at a single site and adopt a written statement of reasons explaining the finding." The State defendants reasonably suggest this regulatory language, expressly adopted to incorporate the holding and reasoning of the *Ridgecrest* decision, allows a school district to accommodate students of the charter school at more than one site provided the school district makes a finding to that effect and adopts a written statement of reasons explaining the finding.

---

[6] A provision in Regulations, section 11969.3, subdivision (a)(1), makes it clear that "[t]he district is not obligated to pay for the modification of an existing school site to accommodate the charter school's grade level configuration." On the other hand, "[a]lthough the district is not obligated to pay for the modification of an existing school site to accommodate the charter school's grade level configuration, nothing in this article shall preclude the district from entering into an agreement with the charter school to modify an existing school site, with the costs of the modifications being paid exclusively by the charter school or by the school district, or paid jointly by the district and the charter school." (Regs., § 11969.3, subd. (a)(4).)

■ We conclude the State Board " 'reasonably interpreted the legislative mandate' " in enacting the definition of contiguous in section 11969.2(d). (*State Farm, supra*, 32 Cal.4th at p. 1040.)

2. *Regulations, Section 11969.3, Subdivision (a)(1) "Conditions Reasonably Equivalent" (Regulations, section 11969.3(a)(1))*

■ Section 47614 expressly authorizes the State Board to adopt regulations "defining the term[] . . . 'conditions reasonably equivalent.' " (§ 47614, subd. (b)(6).) The State Board did so in Regulations, section 11969.3.

Regulations, section 11969.3, subdivision (a) was amended in 2008 to read, as pertinent to the School District Associations' challenge to the regulation, as follows (new language is underscored; deleted language is struck out):

"The following provisions shall be used to determine whether facilities provided to a charter school are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district providing facilities, as required by Education Code section 47614(b).

"(a) Comparison Group.

"(1) The standard for determining whether facilities are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district providing facilities shall be a comparison group of school district-operated schools with similar grade levels. If none of the district-operated schools has grade levels similar to the charter school, then a contiguous facility within the meaning of subdivision (d) of section 11969.2 shall be an existing facility that is most consistent with the needs of students in the grade levels served at the charter school. The district is not obligated to pay for the modification of an existing school site to accommodate the charter school's grade level configuration."

The School District Associations object to the new sentence: "If none of the district-operated schools has grade levels similar to the charter school, then a contiguous facility within the meaning of subdivision (d) of section 11969.2 shall be an existing facility that is most consistent with the needs of students in the grade levels served at the charter school." The School District Associations claim the sentence again seeks to compel school districts to

accommodate all of the charter school students at a single site, "an existing facility," thereby requiring the districts to ignore the grade level configuration of their schools. The School District Associations contend the regulation "seeks to describe what is 'reasonably equivalent' by specifically telling school districts to ignore what is reasonably equivalent." The School District Associations complain the challenged sentence is not a definition of the comparison group for purposes of determining reasonable equivalency as the subdivision purports to be, but is an additional definition of contiguous that is inconsistent with section 47614 for the reasons previously argued.

Largely for the reasons already expressed, we reject the School District Associations' claims.

The question before us is not whether the State Board appropriately placed the challenged sentence in Regulations, section 11969.3 dealing with the determination of conditions of reasonable equivalency. Nor are we called upon to offer an opinion on whether the challenged sentence in Regulations, section 11969.3(a)(1) could perhaps have been drafted with additional clarity. The question before us is only whether the provision is inconsistent with section 47614, alters or amends section 47614, or enlarges its scope. (*Slocum v. State Bd. of Equalization, supra*, 134 Cal.App.4th at p. 974; *People ex rel. Dept. of Alcoholic Beverage Control v. Miller Brewing Co., supra*, 104 Cal.App.4th at pp. 1198–1199; *Terhune v. Superior Court, supra*, 65 Cal.App.4th at pp. 872–873; Gov. Code, §§ 11342.1, 11342.2.) We must determine whether the agency " 'reasonably interpreted the legislative mandate' " in enacting the regulation. (*State Farm, supra*, 32 Cal.4th at p. 1040.) We find the regulation valid by these standards.

It is clear from its language that the challenged amendment is intended to recognize there may be no existing district school serving all the same grade levels as the charter school for purposes of comparison. This is confirmed by a review of the State Board's explanation for the amendment to the regulation.

In its initial statement of reasons for the amendment to Regulations, section 11969.3(a)(1), the State Board explained the regulation as follows: "Subdivision (a) describes the creation of a comparison group of schools. Following consideration of input received through the workgroup process, two sentences have been added to paragraph (1). These added sentences address the situation in which a comparison group as envisioned in the existing regulations cannot be assembled. In such a situation, the comparison group includes all of the district-operated schools serving any of the grade levels served by the charter school. A contiguous facility in such a situation is a facility that is most consistent with the needs of students in the grade levels

served at the charter school. [¶] An example of a situation in which this might be applicable is a charter school that serves kindergarten through grade eight in a school district that is configured solely of sites that are either for elementary grades (kindergarten through grade five) or for middle grades (grades six through eight). In such a situation, the issue of a 'contiguous' facility as required by law is to be determined based on consistency with the needs of students in the grade levels served at the charter school, recognizing that modification of a site may be necessary to serve the charter school's students."

The State Board's final statement of reasons for the amendment summarizes the amendment as follows: "Section 11969.3(a) (Definition of Comparison Group). Amend to clarify that if the district's grade level configuration is different from the charter school's, the district is to provide the charter school an existing facility that is most consistent with the charter school's grade level configuration, but that the school district is not obligated to modify an existing facility to accommodate the charter school's grade level configuration."

Thus, the amended language of Regulations, section 11969.3(a)(1) is intended to offer a practical solution to the situation where there is no directly applicable comparison district school for the grade level configuration of the charter school. In such a situation, it directs a school district to provide facilities to the charter school on an existing district school site that is most consistent with the needs of students in the grade levels served at the charter school. (§ 11969.3(a)(1).)

The provision does not require school districts to ignore the grade level configuration of their schools or tell "school districts to ignore what is reasonably equivalent," as the School District Associations claim. The facilities provided must still meet the requirements of reasonable equivalency based on a comparison with the district's schools that have grade levels similar to the charter school as stated in the sentence before the challenged provision in Regulations, section 11969.3(a)(1). The facilities must still meet the requirements of reasonable equivalency specified by Regulations, section 11969.3, subdivisions (b), regarding capacity, and (c), regarding condition, unless the charter is a conversion charter school, in which case "the condition of the facility previously used by the school district at the site shall be considered to be reasonably equivalent to the condition of school district facilities for the first year the charter school uses the facility" (Regs., § 11969.3, subd. (c)(2)).

In directing the district to provide the charter school facilities at an existing district facility, the regulation does no more than recognize the

contiguity requirement of section 47614, as previously discussed. It does not eliminate the ability of a school district to propose accommodation to the charter school at more than one school site upon "a finding that the charter school could not be accommodated at a single site" with "a written statement of reasons explaining the finding." (Regs., § 11969.2(d).)

■ The School District Associations have not shown the regulation to be invalid. (*Mineral Associations, supra*, 138 Cal.App.4th at p. 589.)

3. *Regulations, Section 11969.2, Subdivision (e) "Furnished and Equipped" (Regulations, section 11969.2(e))*

■ Section 47614 requires the facilities made available to charter schools by each school district to be "furnished . . . and equipped." (§ 47614, subd. (b).) The third regulation the School District Associations challenge is Regulations, section 11969.2(e), which defines "furnished and equipped" for purposes of section 47614.

Regulations, section 11969.2(e) was amended in 2008 to read as follows (new language is underscored; deleted language is struck out): "(e) Furnished and Equipped. As used in Education Code section 47614(b), a facility is 'furnished and equipped' if it includes all the reasonably equivalent furnishings and equipment necessary to conduct classroom-based instruction (i.e., at a minimum, desks, chairs, and blackboards) and to provide for student services that directly support classroom instruction as found in the comparison group schools established under section 11969.3(a), and if it has equipment that is reasonably equivalent to that in the comparison group schools. 'Equipment' means property that does not lose its identity when removed from its location and is not changed materially or consumed immediately (e.g., within one year) by use. Equipment has relatively permanent value, and its purchase increases the total value of a Local Educational Agency's (LEA's) physical properties. Examples include furniture, vehicles, machinery, motion picture film, videotape, furnishings that are not an integral part of the building or building system, and certain intangible assets, such as major software programs. Furnishings and equipment acquired for a school site with non-district resources are excluded when determining reasonable equivalence."

The School District Associations contend amended Regulations, section 11969.2(e) is invalid because it defines equipment in a way that is inconsistent with Proposition 39 and a related statute and because it forces school districts to use unrestricted general fund revenues to provide facilities to charter schools in violation of section 47614, subdivision (b)(1). We reject each claim.

A. *Consistency of the Regulatory Definition With Proposition 39 and Statutory Law*

In adopting Proposition 39, the voters of California expressed the intent "that public school facilities should be *shared* fairly among all public school pupils, including those in charter schools." (§ 47614, subd. (a), italics added.) Proposition 39 amended section 47614 to provide, in relevant part, that "[e]ach school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district. *Facilities provided shall be* contiguous, *furnished, and equipped,* and shall remain the property of the school district." (§ 47614, subd. (b).)

The terms "furnished" and "equipped" are not defined by section 47614. Section 47614, subdivision (b)(6), expressly authorizes the State Board to adopt "regulations implementing this subdivision, including but not limited to defining the terms . . . ."

The School District Associations claim the definition of "furnished" and "equipped" adopted by the State Board in Regulations, section 11969.2(e) is inconsistent with Proposition 39. Relying on the principle of statutory construction that terms within a statute or within the same act possess a consistent meaning (*People v. Standish* (2006) 38 Cal.4th 858, 870 [43 Cal.Rptr.3d 785, 135 P.3d 32]; *People v. Roberge* (2003) 29 Cal.4th 979, 987 [129 Cal.Rptr.2d 861, 62 P.3d 97]; *People v. Contreras* (1997) 55 Cal.App.4th 760, 764 [64 Cal.Rptr.2d 233]), the School District Associations argue equipment must be defined as property of a permanent nature, which they argue the Legislature has defined in another Education Code statute as property with a useful life of at least 20 years (§ 15100, subds. (e) & (i)), not as property with a life of a year and a day as defined by Regulations, section 11969.2(e) (equipment is property that is not "consumed immediately (e.g., within one year) by use").

We begin with the claim that section 11969.2(e) is inconsistent with Proposition 39.

In addition to amending section 47614, Proposition 39 amended article XIII A of the California Constitution to add a new exception to its 1 percent limitation of ad valorem tax on real property. (Cal. Const., art. XIII A, § 1, subd. (b)(3); Prop. 39, as approved by voters, Gen. Elec. (Nov. 7, 2000).) The new provision allows a school district, community college district, or county office of education to incur bonded indebtedness "for the construction,

reconstruction, rehabilitation, or replacement of school facilities, *including the furnishing and equipping of school facilities*, or the acquisition or lease of real property for school facilities, approved by 55 percent of the voters of the district or county, as appropriate." (Cal. Const., art. XIII A, § 1, subd. (b)(3), italics added.) The use of the proceeds of such bonds is restricted to "the purposes specified in Article XIII A, Section 1(b)(3), and not for any other purpose, including teacher and administrator salaries and *other school operating expenses*." (*Id.*, subd. (b)(3)(A), italics added.)

That is, article XIII A of the California Constitution allows school bond funds to be used for furnishing and equipping school facilities, but prohibits school bond funds from being used to pay school operating expenses. Applying this distinction between equipment and operating expenses to section 47614, also adopted by Proposition 39, the School District Associations argue the voters did not intend operating expenses to be included in a definition of furniture and equipment under section 47614.

 However, even accepting this point for purposes of argument, we do not read Regulations, section 11969.2(e) as incorporating operating expenses within its definition of equipment. Section 11969.2(e) defines equipment as "property that does not lose its identity when removed from its location and is not changed materially or consumed immediately (e.g., within one year) by use. Equipment has relatively permanent value, and its purchase increases the total value of a Local Educational Agency's (LEA's) physical properties." An operating expense is not property that falls within this definition. Section 11969.2(e) is not inconsistent with Proposition 39 as alleged by the School District Associations.

The School District Associations assert, however, the definition of "equipment" in Regulations, section 11969.2(e) is invalid because it is inconsistent with section 15100, which specifies the allowable purposes for a bond election as including "[t]he supplying of school buildings and grounds with furniture, equipment, or necessary apparatus of a permanent nature" (§ 15100, subd. (e)) and "[t]he purchase of schoolbuses the useful life of which is at least 20 years" (§ 15100, subd. (i)). The School District Associations argue section 47614 should be construed consistently with section 15100 to include a definition of equipment as property with a permanent nature and a useful life of at least 20 years.[7] The School District Associations contend we should look to section 15100 because "[t]he Legislature enacted section

---

[7] In their reply brief, the School District Associations disavow their claim that equipment under section 47614 must in all cases have a useful life of at least 20 years. Such concession is appropriate as many items of school property do not have an anticipated life of 20 years or more and yet plainly fall within the ordinary meaning of the term "equipment." We offer computers as one example.

15264–15276, the Strict Accountability in Local School Construction Bond Act of 2000 contingent on the passage of Proposition 39" and "[t]hat act authorized governing boards of school districts to issue bonds pursuant to Chapter 1 (commencing with section 15100)."

 We disagree that section 47614 should be interpreted to incorporate subdivisions (e) and (i) of section 15100. Nothing in section 47614 references either the strict accountability in the Local School Construction Bond Act (§ 15264 et seq.) or section 15100. These statutes were not enacted by Proposition 39 and they deal with the use of school bond funds, not the sharing of facilities, which is the subject of section 47614.[8] Section 47614 requires school districts to "share[] fairly" property the districts already have with charter schools by making available to the charter schools facilities that are furnished and equipped. (§ 47614, subds. (a) & (b).) Nothing suggests that the property shared is limited to what the district could purchase using bond funds.

The definition of equipment in Regulations, section 11969.2(e) is consistent with Proposition 39, including section 47614.

### B. The Definition of Furnish and Equip Does Not Require School Districts to Use Unrestricted General Funds

The School District Associations also contend that the definition of "equipment" adopted by the State Board in Regulations, section 11969.2(e) is so expansive that it results in an inconsistency with the portion of section 47614 that states: "No school district shall be required to use unrestricted general fund revenues to rent, buy or lease facilities for charter school students." (§ 47614, subd. (b)(1).) Providing an elaborate discussion of the three general sources for school funding (average daily attendance or "ADA" funding; categorical funding; and capital facilities funding), the School District Associations contend section 11969.2(e) ignores the clear limitations imposed by the funding statutes on the uses of school funds and requires school districts to furnish, equip, and even provide supplies for the facilities they make available to the charter schools.

The School District Associations claim the problem posed by the regulation is illustrated by the following example they used before the trial court. "[We] described a typical situation where a charter school is sharing space within a traditional school operated by the school district. It is impossible for two

---

[8] As we reject the argument that section 47614 should be interpreted to incorporate the provisions of section 15100 based on the different subject matters of the statutes, we need not address the parties' arguments regarding the meaning, including the appropriate grammatical construction, of subdivision (e) of section 15100.

school entities to share the administrative office, occupying desks, using telephones, computers, and so on at the same time. Therefore, the charter school needs its separate administrative office. The school district converts a classroom for those purposes. That classroom to be used by the charter school as an administrative office now needs to be furnished and equipped with office desks, chairs, telephones, copiers, computers, internet access, etc. The regulation defining furnish and equip would impose on the school district the burden of purchasing duplicate office furniture and equipment for the charter school. The only funds available for the school districts to do that is their unrestricted general fund revenues."

The fundamental flaw in the School District Associations argument and example is the assumption that section 47614 requires school districts to *purchase* anything for the charter schools. Section 47614 requires school districts to *share* facilities, including furniture and equipment. Nothing in section 47614 or the definition of equipment in Regulations, section 11969.2(e) requires a school district to purchase or obtain more facilities, furniture or equipment to share with the charter school. As recognized by the trial court, a school district's only obligation under the statute and the regulations "is to share its furnished and equipped facilities with charter schools." (See Regs., § 11969.3, subd. (b)(2) & (3).) As noted by the State Board in its response to comments received about section 11969.2(e) during the initial public comment period, "[t]he charter school is entitled to the use [of] (access to) equipment, but there is no requirement for a school district to purchase separate equipment for the charter school. The proposed regulations create no funding obligation that exceeds the statute itself."

Thus, in the hypothetical example provided by the School District Associations, it may be necessary for the two school entities—the district school and the charter school, to share administrative offices. We see no reason to believe it will be impossible for them to do so in all cases. But, in cases where administrative offices cannot be shared and the school district converts a classroom into an administrative office for the charter school, section 47614 requires the school district to review the furnishings and equipment it provides to its school administrative offices and either determine a method of sharing the use of such property or divide that property in such a way as to fairly share it with the charter school. (§ 47614, subd. (a).) True—this may mean in some cases both the district schools and the charter school will be inconvenienced to some extent and must make do with less.

We conclude the definition of the equipment to be shared in Regulations, section 11969.2(e) is consistent with the provision in subdivision (b)(1) of section 47614 that specifies "[n]o school district shall be required to use unrestricted general fund revenues to rent, buy, or lease facilities for charter school students."

The School District Associations have not shown the regulation to be invalid. (*Mineral Associations, supra,* 138 Cal.App.4th at p. 589.)

4. *Regulations, Section 11969.7, Subdivision (f) (Regulations, section 11969.7(f))*

This regulation harmonizes two statutes as follows: Section 47614, subdivision (b)(1) provides in full: *"The school district may charge the charter school a pro rata share* (based on the ratio of space allocated by the school district to the charter school divided by the total space of the district) *of those school district facilities costs which the school district pays for with unrestricted general fund revenues. The charter school shall not be otherwise charged for use of the facilities.* No school district shall be required to use unrestricted general fund revenues to rent, buy, or lease facilities for charter school students." (Italics added.)

Section 47613 provides that a chartering authority may charge a charter school for costs of required supervisorial oversight as follows: "(a) Except as set forth in subdivision (b), a chartering authority *may charge for the actual costs of supervisorial oversight of a charter school not to exceed 1 percent* of the revenue of the charter school. [¶] (b) A chartering authority *may charge for the actual costs of supervisorial oversight* of a charter school *not to exceed 3 percent* of the revenue of the charter school *if the charter school is able to obtain substantially rent free facilities from the chartering authority."* (Italics added.)

Seeking to coordinate the provisions of these two statutes, the State Board adopted Regulations, section 11969.7(f) in 2008. Section 11969.7(f) states: "If a school district charges a charter school for facilities costs pursuant to this article, and if the district is the charter school's authorizing entity, the facilities are not substantially rent free within the meaning of Education Code section 47613, and the district may only charge for the actual costs of supervisorial oversight of the charter school not to exceed one percent of the school's revenue."

The School District Associations contend Regulations, section 11969.7(f) is inconsistent with both sections 47613 and 47614 because it equates "facilities cost" to "rent," forcing a school district into a "catch-22 situation" where it must choose between recovering a share of its facilities cost or its supervisorial oversight cost, but cannot collect both. We conclude the State Board " 'reasonably interpreted the legislative mandate' " in enacting section 11969.7(f). (*State Farm, supra,* 32 Cal.4th at p. 1040.)

As the trial court recognized, the Charter Schools Act (§ 47600 et seq.) does not define the term "rent." The State Board has authority to "fill up the

details" by defining the meaning of the phrase "substantially rent free" in section 47613. (*Marshall v. McMahon, supra,* 17 Cal.App.4th at p. 1848; *Mineral Associations, supra,* 138 Cal.App.4th at p. 589.) Regulations, section 11969.7(f) provides a reasonable definition that comports with the usual meaning of the term rent and is consistent with the plain language of section 47614.

■ Section 47614 authorizes a school district to charge a charter school a pro rata share of those school district facilities costs the district pays for with unrestricted general funds. (§ 47614, subd. (b)(1).) Section 47614 prohibits the charter school from "otherwise" being "charged for the use of the facilities." (*Id.,* subd. (b)(1).) The inclusion of the word "otherwise" in section 47614, subdivision (b)(1) indicates the pro rata facilities cost charge being authorized is considered a charge for the charter school's "use" of the school district's facilities. " 'Rent' is generally defined as payment made for the use of property." (*Davies Machinery Co. v. Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 27 [113 Cal.Rptr. 784]; accord, 7 Miller & Starr, Cal. Real Estate (3d ed. 2004) Landlord and Tenant, § 19:77, p. 217.) Thus, the State Board properly equated the facilities cost charge with rent.

■ Section 47613 limits the amount of supervisorial costs a chartering agency may recoup from a charter school to 1 percent if the facilities it provides to the charter school are not "substantially rent free." (*Id.,* subds. (a) & (b).)

Regulations, section 11969.7(f) simply applies the limitation of section 47613 to a school district that is the chartering authority for a charter school when the school district chooses to charge the charter school the section 47614, subdivision (b)(1) pro rata facilities cost. It is reasonable for the regulation to apply only to a school district that is the chartering agency for the charter school and not other chartering authorities because only chartering school districts both share facilities with a charter school and incur supervisorial costs.

The School District Associations argue against this conclusion on a number of grounds.

First, the School District Associations claim a different conclusion is required when the interrelationship between section 47613 and the prior version of section 47614 is considered. We disagree.

In 1998, section 47613.7 and section 47614 were added to the Charter Schools Act. (Stats. 1998, ch. 34, §§ 14 & 15, p. 202.) Section 47613.7 for the first time allowed a chartering agency to charge supervisorial costs of up

to 3 percent of the revenue of the charter school "if the charter school is able to obtain substantially rent free facilities from the chartering agency." (Stats. 1998, ch. 34, § 14, p. 202.) Otherwise, the chartering agency was limited to charging up to 1 percent of the revenue of the charter school for supervisorial costs. (*Ibid.*) Section 47613.7 was renumbered section 47613 in 1999. (Stats. 1999, ch. 78, § 32.6, p. 1197.) Former section 47614 provided that "[a] school district in which a charter school operates shall permit a charter school to use, at no charge, facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes provided the charter school shall be responsible for reasonable maintenance of those facilities." (Stats. 1998, ch. 34, § 15, p. 202.) Read together, we read the 1998 statutes to have required a school district to provide facilities it was not currently using for teaching or administrative purposes or that it had not historically used for rental purposes to charter schools rent free and to have authorized such a school district to charge the higher 3 percent supervisorial cost if it was the charter school's chartering agency. If, however, the chartering school district chose to rent facilities it historically rented out to others to the charter school, it could do so, but was limited to the 1 percent formula for supervisorial costs.

 In 2000, Proposition 39 amended section 47614 to require school districts to share fairly their facilities with charter schools. Subdivision (b)(1) of section 47614 allows a school district sharing its facilities with a charter school the option of charging the charter school a pro rata share of the district's unrestricted general funded facilities costs. (§ 47614, subd. (b)(1) ["The school district *may* charge the charter school a pro rata share . . . ." (italics added)].) Proposition 39 did not amend section 47613. So, read together, the statutes still allow a school district to provide facilities to a charter school without charge and if the school district is the charter school's chartering agency, it is then entitled to the higher 3 percent formula for its supervisorial costs. Just as with the prior statutes, however, a chartering school district that charges the charter school for the use of its facilities will be limited to the 1 percent formula for supervisorial costs. Consistent with this statutory construction, Regulations, section 11969.7(f) recognizes a chartering school district that chooses to charge the charter school for the pro rata share of its facilities costs is not providing the facilities substantially rent free.

To support their argument that facilities cost is not rent, the School District Associations next claim the facilities cost referred to in section 47614 is principally maintenance and operations costs, allowed in place of the previous requirement that the charter school be responsible for the reasonable maintenance of the facilities provided by the school district. (Stats. 1998, ch. 34, § 15, p. 202.) As a substitute for the charter school's obligation to

maintain and operate the facilities, the School District Associations argue the facilities costs cannot be construed as "rent."

We disagree. The facilities costs that may be charged against the charter school in section 47614 do not supplant the charter school's responsibility for its ongoing maintenance and operations costs. As the Charter Association points out, a charter school still has the responsibility for the ongoing operations and maintenance of the facilities, furnishings, and equipment provided by the school district. (Regs., § 11969.4, subd. (b).) And although certain subdivisions of section Regulations, 11969.7 include "costs associated with plant maintenance and operations" and school district contributions from unrestricted general fund revenues to various specified district maintenance accounts, in the facilities costs used for the calculation of the pro rata share charge to the charter school (§ 11969.7, subd. (a), (a)(1) & (2); see also Regs., § 11969.2, subd. (h)), another provision of section 11969.7 expressly excludes "any costs that are paid by the charter school, including, but not limited to, costs associated with ongoing operations and maintenance . . . ." (§ 11969.7, subd. (a).) Thus, charter schools retain the responsibility for ongoing operations and maintenance and the facilities costs charge is not a substitute for such obligation. Nothing in the other regulations adopted by the State Board precludes the facilities costs charge from being considered a form of rent for purposes of section 47613.

The School District Associations argue the Legislature recognized that charter schools receiving equivalent facilities under section 47614 were receiving those facilities "rent-free" when it enacted section 47614.5, the Charter School Facility Grant Program. We find no such recognition in section 47614.5.

The Charter School Facility Grant Program does not speak expressly or impliedly to the issue of whether the facilities costs charge in section 47614 is reasonably construed as rent for purposes of section 47613. Section 47614.5 states the grant program "is intended to provide assistance with facilities rent and lease costs for pupils in charter schools." (§ 47614.5, subd. (a).) But a charter school "receiving reasonably equivalent facilities from [its] chartering authority pursuant to Section 47614" is ineligible for grant funds. (*Id.*, subd. (d)(3).) In excluding charter schools receiving facilities under section 47614 from the grant program, it appears the Legislature simply chose to offer financial support to charter schools that choose to rent or lease suitable facilities instead of requesting to share facilities with a school district for which a school district may or may not choose to charge the pro rata facilities cost.

 We conclude Regulations, section 11969.7(f) is consistent and does not conflict with the governing statutes. (*Mineral Associations, supra*, 138 Cal.App.4th at p. 589.)

5. *Regulations, Section 11969.9, Subdivision (c)(1)(C) "Content of Written Facilities Request" (Regulations, section 11969.9(c)(1)(C))*

 Section 47614 requires each charter school desiring facilities from a school district to annually provide the school district "with a reasonable projection of the charter school's average daily classroom attendance by in-district students for the following year." (§ 47614, subd. (b)(2).) "The district shall allocate facilities to the charter school for that following year based upon this projection." (*Ibid.*)

The State Board adopted Regulations, section 11969.9 to provide procedures and timelines for the annual request for, reimbursement for, and for provision of facilities to a charter school under section 47614. In 2008, the State Board amended subdivision (c) of section 11969.9, as relevant on appeal here, as follows (new language is underscored; deleted language is struck out):

"(c)(1) The written facilities request consists of must include:

"(A) reasonable projections of in-district and total ADA and in-district and total classroom ADA, based on ADA claimed for apportionment, if any, in the fiscal year prior to the fiscal year in which the facilities request is made, adjusted for expected changes in enrollment in the forthcoming fiscal year;

"(B) a description of the methodology for the projections;

"(C) if relevant (i.e., when a charter school is not yet open or to the extent an operating charter school projects a substantial increase in in-district ADA), documentation of the number of in-district students meaningfully interested in attending the charter school that is sufficient for the district to determine the reasonableness of the projection, but that need not be verifiable for precise arithmetical accuracy."

The School District Associations argue the new language of Regulations, section 11969.9(c)(1)(C) that exempts certain charter schools from the documentation requirement is inconsistent with the specific language in section 47614, subdivision (b)(2) that requires charter schools to annually provide the school district "with a reasonable projection" of next year's in-district student ADA and then requires school districts to provide reasonably equivalent facilities based on such projections. The School District Associations assert

the new language of section 11969.9(c)(1)(C) is inconsistent with the appellate rulings in *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185 [5 Cal.Rptr.3d 86] (*Sequoia*) and *Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139 [18 Cal.Rptr.3d 417] (*Environmental Charter*). We find no inconsistency.

In *Sequoia, supra,* 112 Cal.App.4th 185, a high school district (Sequoia) brought an action for declaratory relief seeking an order that a school district is not required to provide funding or facilities for a charter school that was approved by another school district and specifically that it was not required to provide facilities to Aurora Charter High School (Aurora). (*Sequoia, supra,* at p. 190.) Aurora cross-complained for, among other things, a peremptory writ of mandate compelling Sequoia to provide facilities pursuant to section 47614. (*Sequoia, supra,* at p. 190.) Aurora submitted a declaration explaining and supporting its ADA projections for its facilities request. (*Ibid.*) The trial court concluded Aurora's projected enrollment and attendance were reasonable, and therefore Sequoia was obligated to provide facilities. (*Ibid.*) The Court of Appeal affirmed. (*Id.* at p. 197.)

In addressing Sequoia's claim that Aurora had failed to demonstrate a reasonably projected enrollment of the minimum number of in-district students for purposes of section 47614 (*Sequoia, supra,* 112 Cal.App.4th at p. 194), the appellate court noted section 47614 "is silent as to any mechanism for calculating the 'reasonable projection' of in-district students, the evidentiary standard of proof for the projection, the procedure for the district to question the reasonableness of the projection, or the district's right to deny the request when the school's projection is for 80 or more units of average daily attendance." (*Sequoia, supra,* at p. 195.) The court concluded, however, that "[b]y modifying 'projection' with the adjective 'reasonable' (§ 47614, subd. (b)(2)), the statute necessarily implies the charter school must offer *some explanation* in its facilities request for the basis for its projection." (*Id.* at pp. 195–196, italics added.) "However, the statute does not require the school to demonstrate arithmetical precision in its projection or provide the kind of documentary or testimonial evidence that would be admissible at a trial. Rather, the school is subsequently penalized if its projection was incorrect by having to reimburse the district for over-allocated space. (§ 47614, subd. (b)(2).)" (*Id.* at p. 196.)

In a footnote, the appellate court in *Sequoia, supra,* 112 Cal.App.4th at page 196, noted that the State Board had adopted regulations defining the procedures and timelines for the request of facilities that had become operative one day after the hearing on this case. (*Id.* at p. 196, fn. 4.) The court stated: "Even if [the] regulations were fully operative when Aurora made its

December 2001 facilities request, Sequoia's March 2002 denial would be an abuse of discretion. Although the regulations permit a district to question the projected enrollment, they do not permit the district to deny the request once the school has responded to the district's concerns *with a showing* of a projected 80 units of average daily attendance." (*Ibid.*, italics added.)

 Regulations, section 11969.9(c)(1)(C) is not inconsistent with either section 47614, subdivision (b)(2) or *Sequoia.*

Section 47614 requires every charter school requesting facilities from a school district to provide the district with "a reasonable projection" of its ADA for the following year. (§ 47614, subd. (b)(2).) *Sequoia, supra*, 112 Cal.App.4th 185, interpreted this statutory phrase to require "some explanation in its facilities request for the basis for its projection." (*Id.* at p. 196.) Under the prior regulations, the charter school must make "a showing" of the projected ADA. (*Id.* at p. 196, fn. 4.)

 The amended regulation still expressly requires all charter schools to provide the school district with a written facilities request that includes a reasonable projection of the charter school's ADA "based on ADA claimed for apportionment, if any, in the fiscal year prior to the fiscal year in which the facilities request is made, adjusted for expected changes in enrollment in the forthcoming fiscal year" (Regs., § 11969.9(c)(1)(A)) and a description of the methodology for the projections (§ 11969.9, subd. (c)(1)(B)). These projections must be "broken down by grade level and by the school in the school district that the student would otherwise attend." (§ 11969.9, subd. (c)(2).) Section 11969.9(c)(1)(C) further requires "if relevant . . . , documentation of the number of in-district students meaningfully interested in attending the charter school that is sufficient for the district to determine the reasonableness of the projection, but that need not be verifiable for precise arithmetical accuracy." Section 11969.9(c)(1)(C) now defines when such documentation is "relevant" as those situations "when a charter school is not yet open or to the extent an operating charter school projects a substantial increase in in-district ADA." Thus, a charter school that is already open and that does not project a substantial increase in in-district ADA does not have to provide the additional documentation described in the regulation. However, in those situations, there is still "some explanation" and "a showing" of the charter school's projected ADA because the facilities request must still explain the charter school's methodology, break down its projections into grade level and district school that would otherwise be attended, and the district can access the charter school's prior year documentation to evaluate the request. If the charter school overestimates its projected ADA, the district will be entitled to reimbursement for overallocated space. (§ 47614, subd. (b)(2).)

Furthermore, additional provisions in Regulations, section 11969.9 provide the school district with an opportunity to review and object to the charter school's ADA projections, and to provide it own projections for what it considers reasonable. (§ 11969.9, subd. (d).) If a school district expresses objections and provides its own projections, a charter school must respond to such objections and projections. (§ 11969.9, subd. (e).)

 Considered together, the provisions of Regulations, section 11969.9 require a charter school to provide a school district with some explanation, based on a documentary showing, of its ADA projections. Although the School District Associations argue more information is necessary, we see no reason to believe, on this facial challenge to the regulation, that the information required by section 11969.9 will be insufficient to allow a school district to carry out its duties to evaluate the facilities request and provide reasonably equivalent facilities.

This brings us to *Environmental Charter, supra*, 122 Cal.App.4th 139. In *Environmental Charter*, a charter school (Environmental) submitted a request for facilities to Centinela Valley Union High School District (Centinela) based on section 47614, subdivision (b). (*Environmental Charter, supra* 122 Cal.App.4th at pp. 142–143.) Environmental included in its request for facilities a projection of the number of its in-district students, broken down by grade level, as well as information about its instructional calendar, the general geographical area in which it wished to be located and its special facilities needs for its program. (*Id.* at p. 143.) Centinela requested more detailed information that would include the student names and dates of birth, home addresses, names of parents or guardians, grade levels, and schools and school districts attended. (*Ibid.*) Eventually, Centinela denied Environmental's facilities request based on it lacking the documentation required by Regulations, former section 11969.9(c)(1)(C). (*Environmental Charter, supra*, at p. 143.) Environmental filed a petition for writ of mandate seeking to compel Centinela to process its request and the trial court ordered Centinela to provide Environmental with facilities. (*Id.* at pp. 143–144.) The appellate court reversed. (*Id.* at p. 154.)

The court in *Environmental Charter, supra*, 122 Cal.App.4th at pages 149–150, concluded the plain language of Regulations, former section 11969.9 made the regulation, including former subdivision (c)(1)(C), applicable to all charter schools, not just new charter schools as Environmental claimed. "This reading is consistent with section 47614, subdivision (b)(2) because both, by their language, cover *any* facilities request." (*Environmental Charter, supra*, at p. 149.) The court rejected Environmental's claim that *Sequoia, supra*, 112 Cal.App.4th 185, "negate[d] any argument that a charter school is required to provide student information." (*Environmental Charter,*

*supra*, at p. 150.) Although *Sequoia* did not consider what specific documentation was required, the court in *Environmental Charter* found the reference to a "showing" in *Sequoia* "was acknowledgement of the documentation requirement." (*Environmental Charter, supra*, at p. 150.) The court found nothing in section 47614 conflicted with a requirement that a facilities request include documentation. (*Environmental Charter, supra*, at pp. 150–151.) In a footnote, the court noted *Environmental* made nothing of the "if relevant" language of section 11969.9(c)(1)(C) other than to suggest it was meant to limit the documentation requirement to new charter schools. (*Environmental Charter, supra*, at p. 151, fn. 6.) The court stated its view that "documentation is always relevant if enrollment projections are based on underlying foundational data." (*Ibid.*)

Finally, the court in *Environmental Charter* concluded Centinela acted within its discretion in denying Environmental's facilities request. (*Environmental Charter, supra*, 122 Cal.App.4th at pp. 151–153.) The court found a rational connection between Centinela's denial of Environmental's request and the lack of documentation provided by Environmental. (*Id.* at p. 152.) "Due to the lack of documentation, Centinela was unable to verify meaningfully interested students and to satisfy its safety and liability concerns. It acted consistently with the dicta in *Sequoia* by asking that Environmental make a 'showing.' Moreover, Centinela did not grant Environmental's charter or provide it with facilities on a prior occasion. As a result, it was dealing with an unknown commodity and had every right to demand strict regulatory compliance before making a facilities offer." (*Ibid.*) "When a charter school submits a facilities request, it must make a showing of its enrollment projections with relevant documents." (*Id.* at p. 153.)

■ Amended Regulations, section 11969.9(c)(1)(C) is consistent with *Environmental Charter*. First, *Environmental Charter* was concerned with a prior version of section 11969.9(c)(1)(C). Such former regulation plainly required documentation in all charter school facilities requests. Nevertheless, amended section 11969.9 is still consistent with the broader statements of the court in *Environmental Charter* requiring an explanation supported by documentation of facilities requests. Section 11969.9, read as a whole, still requires, as we have already described, a charter school to provide a school district with some explanation, based on a documentary showing, of its ADA projections. Subdivision (c)(1)(C) simply provides that in some cases that explanation will be based, in part, on prior year data and documentation.

6. *Regulations, Section 11969.9, Subdivision (k)(3) "Provision for a Reciprocal Hold-Harmless/Indemnification" (Regulations, section 11969.9(k)(3))*

■ The sixth and last regulation challenged by the School District Associations on this appeal is Regulations, section 11969.9(k)(3), which requires the negotiated facilities agreement between the school district and the charter school to include a reciprocal hold-harmless/indemnification provision. (§ 11969.9(k)(3) ["A reciprocal hold-harmless/indemnification provision shall be established between the school district and the charter school."].)[9]

The workgroup directed to review the 2002 regulations for possible amendments identified the reciprocal hold-harmless/indemnification provision "as a responsible practice to protect the public investment in the facilities used by the charter school, the employees (and volunteers) who work in the facilities, and the school children who attend school in the facilities, whether enrolled in the charter school or in a district-run program."

The School District Associations claim, however, the State Board lacks authority to require this substantive provision because section 47614, subdivision (b)(6) only grants the State Board authority to "defin[e] the procedures and establish[] timelines for the request for, reimbursement for, and provision of, facilities."

Responding to a similar claim made during the comment period for the regulations, the State Board concluded in its final statement of reasons that its broad grant of rule-making authority under section 47614, subdivision (b)(6), was "clearly sufficient" to cover Regulations, section 11969.9(k)(3). It stated: "The reciprocal hold-harmless/indemnification provision is a solid business practice to ensure the security of the public's investment in the facilities owned by the school district and used by the charter school."

---

[9] Regulations, section 11969.9, subdivision (k) provides in full: "The school district and the charter school shall negotiate an agreement regarding use of and payment for the space. The agreement shall contain at a minimum, the information included in the notification provided by the school district to the charter school pursuant to subdivision (h). In addition: [¶] (1) *The charter school shall maintain general liability insurance naming the school district as an additional insured to indemnify the school district for damage and losses for which the charter school is liable. The school district shall maintain first party property insurance for the facilities allocated to the charter school.* [¶] (2) The charter school shall comply with school district policies regarding the operations and maintenance of the school facility and furnishings and equipment. [¶] (3) *A reciprocal hold-harmless/indemnification provision shall be established between the school district and the charter school.* [¶] (4) The school district shall be responsible for any modifications necessary to maintain the facility in accordance with Education Code section 47610(d) or 47610.5." (Italics added.)

We agree that section 47614, subdivision (b)(6) is broad enough to and does authorize the State Board's adoption of Regulations, section 11969.9(k)(3). It is unnecessary to decide whether the provision is actually procedural or substantive. Section 47614 provides the State Board express authority to "*adopt . . . regulations implementing this subdivision, including but not limited to* defining the terms 'average daily classroom attendance,' 'conditions reasonably equivalent,' 'in-district students,' 'facilities costs,' as well as defining the procedures and establishing timelines for the request for, reimbursement for, and provision of, facilities." (§ 47614, subd. (b)(6), italics added.) Section 11969.9(k)(3) is a provision reasonably implementing subdivision (b) of section 47614 by defining what should be included in a facilities agreement between a school district and a charter school based on a responsible and sound business practice for the sharing of facilities. An agency has authority to "fill up" the details of a statutory scheme. (*Mineral Associations, supra,* 138 Cal.App.4th at p. 589; *Marshall v. McMahon, supra,* 17 Cal.App.4th at p. 1848; *Physicians & Surgeons Laboratories, Inc. v. Department of Health Services, supra,* 6 Cal.App.4th at p. 981.)

■ Regulations, section 11969.9(k)(3) is consistent with section 47604, subdivision (c), contrary to the School District Associations' contention.

Section 47604, subdivision (c) provides in relevant part: "An authority that grants a charter to a charter school to be operated by, or as, a nonprofit public benefit corporation is not liable for the debts or obligations of the charter school, or for claims arising from the performance of acts, errors, or omissions by the charter school, if the authority has complied with all oversight responsibilities required by law . . . ."

■ Contrary to the claim of the School District Associations, Regulations, section 11969.9(k)(3) does not require school districts to waive their rights under this statute. As the State defendants point out, a "hold harmless agreement" has been defined as " 'A contractual arrangement whereby one party assumes the liability inherent in a situation, thereby relieving the other party of responsibility.' (Black[']s Law Dict[. (6th ed. 1990) p.] 731.) A 'reciprocal' hold harmless agreement is one, 'Given or owed mutually as between two persons . . . due from one person to another and vice versa.' [(*Id.* at p. 1269.)] Therefore, the provision at issue does not require a party to waive any rights, it simply makes clear that each party is responsible for its own actions." A reciprocal hold-harmless/indemnification provision makes sure each party is protected from the consequences of the other party's acts, errors or omissions while remaining responsible for its own acts, errors and omissions.

## III.

## The Charter Association's Appeal

Out of the 15 regulations challenged by the School District Associations, the trial court found only the five subparagraphs of Regulations, section 11969.3, subdivision (d) to be inconsistent with governing statutes. The trial court granted a judgment directing the issuance of a peremptory writ of mandamus compelling the State defendants to vacate the regulations contained in section 11969.3, subdivision (d)(1), (2)(A), (B), (C) and (D). These regulations pertain only to conversion charter schools, that is, charter schools that are created from converting an existing district school to a charter school. The Charter Association appeals this portion of the judgment claiming the regulations are valid. We agree.

1. *Regulations, Section 11969.3, Subdivision (d)(1) (Regulations, section 11969.3(d)(1)) and Subdivision (d)(2)(A) (Regulations, section 11969.3(d)(2)(A))*

█ Regulations, section 11969.3, subdivision (c)(2) provides that the condition of the facility previously used by the school district at the site of a charter school established at an existing public school site pursuant to section 47605, subdivision (a)(2), 52055.5, 52055.55, or 52055.650 (i.e., conversion charter schools) will be considered to be reasonably equivalent to the condition of school district facilities for the first year the charter school uses the facility. When a conversion charter school has operated at the converted school site for its first year pursuant to subdivision (c)(2), subdivision (d) of section 11969.3 provides additional provisions regarding use of the existing school site by the conversion charter school in subsequent years.

Regulations, section 11969.3(d)(1) provides as follows: "*The school site*, as identified in the school's charter, *shall be made available to the school for its second year of operation and thereafter upon annual request pursuant to Education Code section 47614*. The district is entitled to charge the charter school pro rata costs for the school site pursuant to section 11969.7, and the district is entitled to receive reimbursement for over-allocated space from the charter school pursuant to section 11969.8, except as provided in paragraph (3)." (Italics added.)

Regulations, section 11969.3(d)(2)(A) provides: "If, by material revision of the charter, the location of a charter school is changed, or if one or more additional sites are approved pursuant to Education Code section 47605[, subdivision] (a)(4), then the school is entitled to request and the district shall

provide for the use of facilities by the school in accordance with the revised charter, Education Code section 47614, and the provisions of this article."

The School District Associations made three arguments at the trial court level against these provisions: they were inconsistent with section 47614 because nothing in the Charter Schools Act provides that a conversion charter school is bound to the site or has any greater right to the facilities on the site than any district school or other charter; none of the governing statutes make any distinction between conversion and start-up charter schools with respect to the allocation of facilities; and the regulations improperly give conversion charter schools a right to veto any attempt by the school district to relocate the charter to another site because the only regulatory provision allowing a change of the location of a charter school (Regs., § 11969.3(d)(2)(A)) was limited to situations where a charter school sought and obtained a material revision of its charter.

The trial court concluded the regulations were not inconsistent with section 47614 "merely because they distinguish between conversion charter schools and other charter schools in respect to the allocation of facilities under Proposition 39. The Charter Schools Act includes special provisions regarding establishing charter schools at existing public school sites. (See Ed. Code §§ 47605[, subd.] (a)(2), 52055.5, 52055.55, 52055.650.) Under the Charter Schools Act, if an existing public school converts partially or entirely to a charter school, the charter school is required to adopt and maintain a policy giving admission preference to pupils who reside within the former attendance area of that public school. (Ed. Code, § 47605[, subd.] (d)(1).) Based on these statutes, it was reasonable for [the State Board] to infer that the Charter Schools Act intends that conversion charter schools generally should remain at the same location and serve the same attendance area."

However, the trial court agreed with the School District Associations that section 11969.3, subdivision (d)(1) and (2)(A) are inconsistent with section 47614 "to the extent they give conversion charter schools a right to veto any attempt to relocate the charter to another site. Although a conversion charter school necessarily is tied to the conversion school site during its first year of operation, nothing in the Charter Schools Act gives conversion charter schools an unqualified right to remain at the school site indefinitely. Indeed, such an interpretation would flout the language in [section] 47614, subdivision (b), suggesting charter schools can be moved when 'necessary.' " The trial court concluded the State Board could not "completely divest school districts of the power to move a charter school, as it did here."

On appeal, the Charter Association claims Regulations, section 11969.3(d)(1) and (2)(A) was adopted within the regulatory authority of the

State Board. The School District Associations disagree. The Charter Association contends the trial court correctly found the regulations to be consistent with the Education Code in distinguishing conversion charter schools from start-up charter schools. The School District Associations disagree and argue conversion and start-up charter schools should not be treated differently. The Charter Association disagrees with the trial court that section 11969.3(d)(1) and (2)(A) is inconsistent with section 47614, subdivision (b), which it asserts is either inapplicable to conversion schools or if applicable, is actually in harmony with the regulations. The Charter Association further contends section 11969.3(d)(1) and (2)(A) is required to avoid absurd results. The School District Associations claim the trial court correctly found the regulations were inconsistent with governing statute.[10]

Turning to the issue of whether the adoption of Regulations, section 11969.3(d)(1) and (2)(A) was within the authority of the State Board, we note the Charter Association takes the position that both section 33031 and section 47614 provide the State Board with such authority, while the School District Associations contend subdivision (d) of section 11969.3 exceeds the State Board's authority because it is unrelated to the purpose of section 11969.3, which is defining "conditions reasonably equivalent."

The question of the State Board's authority to adopt Regulations, section 11969.3(d)(1) and (2)(A) is not resolved by considering whether subdivision (d) is correctly placed in section 11969.3. The question is the scope of the board's authority to regulate the school district's provision of facilities to conversion charter schools which are operating at their converted school sites.[11] We conclude such regulation is within the broad range of authority given the State Board by section 47614 to adopt regulations "implementing" subdivision (b) of section 47614, the general authority of the State Board to "fill up" the details of the statutory scheme (*Mineral Associations, supra,* 138 Cal.App.4th at p. 589), and the State Board's general rule-making authority given in section 33031. We reject the School District Associations' claim that section 47614 limits the State Board's authority here to defining the term "conditions reasonably equivalent."

[10] The Charter Association also alleges the State Board's determination of necessity for the regulations is supported by substantial evidence. The School District Associations did not challenge the regulation on such grounds below and do not dispute on appeal the State Board's factual finding of necessity. We limit our consideration to the legal authority for the State Board's adoption of the regulations and the consistency of the regulations with statute.

[11] The School District Associations did not, and do not, challenge the validity of Regulations, section 11969.3, subdivision (c)(2), allowing a conversion charter school to remain at its existing school site for the first year of its operation as a charter school. The School District Associations challenged the provisions of subdivision (d) of section 11969.3 relating to subsequent years of operation by the conversion charter school.

In considering the issue of whether the State Board exercised its authority in a manner that is consistent with governing statutes, the issue is neither whether conversion and start-up charter schools *should not* be treated differently as the School District Associations claim nor whether they *must* be treated differently as the Charter Association claims.[12] The State Board has chosen to treat them differently and to give conversion charter schools greater rights to the continued use of their school site facilities. Our inquiry is limited to whether that choice is consistent with statutory law. (*Yamaha, supra,* 19 Cal.4th at pp. 10–11; *Slocum v. State Bd. of Equalization, supra,* 134 Cal.App.4th at p. 974; Gov. Code, § 11342.2.) Our function is to inquire into the regulation's legality, not its wisdom. (*State Farm, supra,* 32 Cal.4th 1029, 1040.)

While the language of section 47614 itself does not distinguish conversion charter schools from start-up charter schools, other statutes in the Education Code do make such a distinction.

For example, the Legislature has provided different requirements for the formation of charter schools depending on whether they are start-up schools, conversion schools, or the conversion of underachieving schools. A petition to establish a charter school (a start-up school) may be granted upon the signed petition of a number of parents or legal guardians of students that is equivalent to at least 50 percent of the number of students that are estimated will be enrolled in the charter school in the first year or a number of teachers that is equivalent to at least 50 percent of the number of teachers the charter school estimates will be employed at the school in the first year. (§ 47605, subds. (a)(1) & (b).) In contrast, a petition to convert a public school to a charter school may be granted upon the signed petition of not less than 50 percent of the permanent status teachers currently employed at the public school. (*Id.,* subds. (a)(2) & (b).) In addition to charter schools formed under the Charter Schools Act, parents of pupils in certain underachieving schools may apply directly to the State Board to allow them to establish a charter school "at the existing schoolsite." (§§ 52055.5, subd. (b)(3)(B), 52055.55, subd. (b)(3), 52055.650, subd. (h)(2)(B).)

The State Board recognized this difference in formation. In the addendum to final statement of reasons for the regulations, the State Board explained that "[c]harter schools established by conversion are clearly of a different

---

[12] In support of its arguments, the Charter Association requests judicial notice of the State Department of Education first principal apportionment charter school funding rates for the 2009–2010 fiscal year for Alain Leroy Locke Charter High School and Birmingham Community Charter High School. The School District Associations have filed written opposition and objection to the request. The request is denied. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576–578 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see also Gov. Code, § 11350, subd. (d).)

character from other charter schools in relation to facilities. Different statutory provisions govern their creation, and the distinction between them and other charter schools is not 'a false distinction,' as commenters assert. Conversion charter schools are expressly associated with a specific site. The proposed regulations appropriately harmonize . . . Section 47614[, subdivision] (b) with the statutes pertaining to the establishment of charter schools by conversion of existing school sites."

An additional difference between start-up and conversion charter schools has been recognized by the Legislature in the area of student attendance. Generally, charter schools must admit all students who wish to attend to the extent the schools have the capacity to do so. (§ 47605, subd. (d)(2).) The Legislature has provided that admission to a start-up charter may not be determined according to the place of residence of a student, parent or legal guardian. (§ 47605, subd. (d)(1).) However, a different rule applies to conversion charter schools. A conversion charter school is statutorily required to "adopt and maintain a policy giving admission preference to pupils who reside within the former attendance area of that public school." (*Ibid.*) A conversion charter school's student population is thereby forever tied to the community from which it was originally based.

There is further evidence of a legislative distinction between start-up and conversion charter schools in the funding made available to them. For example, the Charter School Revolving Loan Fund (§ 41365) is expressly limited to schools that are not a conversion of an existing school. (*Id.*, subd. (b).) Funds appropriated pursuant to the Charter School Facility Grant Program (§ 47614.5) may not be apportioned to "[c]harter schools occupying existing school district . . . facilities." (*Id.*, subd. (d)(2).)[13] And the statutory formula for determining a school's general purpose entitlement is different for certain conversion charter schools, being tied to the operational expenditures for the school in the year prior to its conversion. (§ 47660, subd. (c)(1).)[14]

---

[13] "Charter schools receiving reasonably equivalent facilities from their chartering authority pursuant to Section 47614" are also precluded from receiving Charter School Facility Grant Program funds. (§ 47614.5, subd. (d)(3).)

[14] Section 47660, subdivision (c)(2), provides: "This subdivision shall not apply to a charter school that is established through the conversion of an existing public school within a unified school district on or after January 1, 2010, which instead shall receive general-purpose funding . . . ." The School District Associations have requested us to take judicial notice of the Senate Rules Committee Floor Analysis for Senate Bill No. 191 (2009–2010 Reg. Sess.), which added subdivision (c)(2) in 2009. (Stats. 2009, ch. 305, § 1.) The School District Associations claim the floor analysis explains the legislative rationale for the adoption of section 47660, subdivision (c)(1) and (2) and rebuts the Charter Association's interpretation of the subdivision. We grant judicial notice of the floor analysis (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 32 [34 Cal.Rptr.3d 520]), but conclude the legislative rationale given does not change the fact the Legislature treats some

The statutes do, therefore, recognize a distinction between conversion and start-up charter schools. The statutes providing for the conversion of under-performing schools expressly ties these converted schools to their "existing schoolsite." (§§ 52055.5, subd. (b)(3)(B), 52055.650, subd. (h)(2)(B); see § 52055.55, subd. (b)(3).) But even conversion charter schools formed under the Charter Schools Act retain links to their former community of teachers, students and parents/legal guardians. Some distinction in funding exists. Therefore, it was not unreasonable for the State Board to also distinguish conversion charter schools from start-up schools and, in context of these statutes, to adopt regulations providing conversion charter schools greater rights to the ongoing use of facilities at their existing school sites. The final statement of reasons for the State Board's adoption of the these regulations indicates they were adopted "to harmonize the requirements of Education Code (EC) Section 47614 with the EC provisions related to these types of charter schools that bind the schools to a specific school site." (Italics omitted.)

The trial court determined, however, that Regulations, section 11969.3(d)(1) and (2)(A) are inconsistent with section 47614 "to the extent they give conversion charter schools a right to veto any attempt to relocate the charter to another site." Indeed, "an unqualified right to remain at the school site indefinitely . . . would flout the language in [section] 47614, subdivision (b), suggesting charter schools can be moved when 'necessary.' "

■ We agree with the trial court that conversion charter schools are not exempt from the sentence in subdivision (b) of section 47614, that provides: "The school district shall make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate, and shall not move the charter school unnecessarily." This language recognizes a school district may move a charter school when it is necessary. The statutory language refers to charter schools without distinguishing between start-up or conversion schools. We see no basis for reading an exclusion into the language for conversion charter schools. All charter schools must make an annual facilities request (§ 47614, subd. (b)(2); Regs., § 11969.9) and in so doing, they annually express where they "wish to locate," even if it is in reality a wish to remain. (§ 47614, subd. (b).) Read as a whole, the sentence applies to all charter schools, regardless of whether they are start-up or conversion charters.

■ We part company with the trial court, however, in its conclusion that Regulations, section 11969.3(d)(1) and (2)(A) give conversion charter schools

conversion charter schools differently from start-up charter schools for purposes of their general purpose entitlement, in some cases basing the charter school's funding on the operational expenditures for the school in the year prior to its conversion. (§ 47660, subd. (c)(1).)

a veto over any move proposed by a school district. Although the regulation does not expressly reference the provisions regarding the State Board's authority to waive any regulation (§§ 33050–33053), section 11969.3(d)(1) and (2)(A) must be viewed in context of such existing authority. We have concluded the State Board has reasonably chosen to adopt regulations giving conversion charter schools what amounts to a presumptive right to remain at their existing school site, if they choose, but if circumstances necessitate moving the charter school, nothing prevents the school district from seeking a waiver of the regulations from the State Board. The requirement that a waiver be sought simply allows the State Board to oversee a school district's determination that a move is necessary.[15]

The trial court erred in concluding Regulations, section 11969.9(d)(1) and (2)(A) are invalid. We shall reverse that portion of the judgment.

2. *Regulations, Section 11969.3, Subdivision (d)(2)(B) (Regulations, Section 11969.3(d)(2)(B)), Subdivision (d)(2)(C) (Regulations, Section 11969.3(d)(2)(C)) and Subdivision (d)(2)(D) (Regulations, Section 11969.3(d)(2)(D))*

Regulations, section 11969.3(d)(2)(B) provides: "If the charter school was established pursuant to Education Code section 47605(a)(2), the district shall change the school's attendance area only if a waiver is first secured from the State Board of Education (SBE) pursuant to Education Code sections 33050–33053 of the requirement in Education Code section 47605[, subdivision] (d)(1) that the school continuously give admission preference to students residing in the former attendance area of the school site."

Regulations, section 11969.3(d)(2)(C) provides: "If the charter school was established pursuant to Education Code sections 52055.5, 52055.55, 52055.650, the district shall relocate the school or change the school's attendance area only if a waiver is first secured from the SBE pursuant to Education Code sections 33050–33053 of the provision of statute binding the school to the existing school site."

Regulations, section 11969.3(d)(2)(D) provides: "If a school district decides to change a charter school's attendance area as provided in subparagraphs (B) or (C), and if the decision occurs between November 1 and June 30 and becomes operative in the forthcoming fiscal year, then the space

---

[15] The language of section 47614, subdivision (b), does not define when a move will be considered "necessary" and is silent as to the manner in which a school district's decision to locate or move a charter school may be reviewed. As the trial court recognized, it was thus left up to the State Board "to fill up the details of the statute in regard to what shall be required for a charter school to be moved."

allocated to the charter school is not subject to reimbursement for over-allocated space pursuant to section 11969.8 in the forthcoming fiscal year."

The trial court ruled the School District Associations had persuasively "shown that subdivision (d)(2)(B) is inconsistent with the Charter Schools Act to the extent it prohibits school districts from changing a conversion charter school's attendance area without a waiver from the [State Board]. As [the School District Associations] correctly argue, the concept of attendance areas is inapplicable to charter schools. Charter schools are required to admit all pupils who wish to attend the school. (. . . § 47605[, subd.] (d)(2).) [¶] The portion of the Charter Schools Act on which [the State Board] relies, [section] 47605[, subdivision] (d)(1), does not impose attendance areas; it merely requires conversion charter schools to give admissions preferences to pupils who reside within the *'former* attendance area' of the converted public school. (. . . § 47605[, subd.] (d)(1) [emphasis added].) [¶] To the extent subdivision (d)(2)(C) and (d)(2)(D) are premised upon a change in a 'charter school's attendance area,' those provisions likewise are inconsistent with the Charter Schools Act. [¶] Accordingly, [the School District Associations] are entitled to a writ of mandate compelling [the State defendants] to vacate the portions of subdivisions (d)(2)(B), (d)(2)(C) and (d)(2)(D) prohibiting school districts from changing a charter school's attendance area."

The School District Associations circulated a draft proposed judgment and peremptory writ that directed the State defendants to vacate Regulations, section 11969.3(d)(2)(B), (C) and (D) (as well as § 11969.3(d)(1) & (2)(A)) in their entirety. The Charter Association and the State defendants objected to the proposed judgment and peremptory writ as broader than the trial court's ruling, which invalidated only "portions" of the regulations. Noting their objections to the drafts circulated by the School District Associations, the State defendants submitted to the trial court a proposed judgment and peremptory writ that directed the State defendants to vacate "section 11969.3, subdivisions (d)(1) and (d)(2)(A), to the extent those provisions give conversion charter schools an unqualified right to remain at the converted school site in perpetuity; and subdivisions (d)(2)(B), (d)(2)(C), and (d)(2)(D), to the extent those provisions purport to restrict school districts from changing a conversion charter school's attendance area."

The School District Associations responded with a letter to the trial court enclosing their proposed judgment and peremptory writ. The School District Associations noted their proposed judgment and writ did not include the limiting language proposed by the State defendants. The School District Associations explained that "[s]pecifically, we have left out of both the Proposed Judgment and Proposed Writ of Mandate the rationale you gave in your conclusion for invalidating section 11963.3 [*sic*] subdivisions (d)(1),

(d)(2)(A)(B)(C), and (D) of Title 5. The reason is two-fold. Your ruling makes explicit your reasons for invalidating those provisions. Also, as we examine those provisions, they deal exclusively with giving conversion charter schools an unqualified right to remain at the converted school site in perpetuity and prevent school districts from changing attendance areas. Since those provisions have no significance other than the purpose that you found to be invalid, the court's order is to vacate those sections."

The Charter Association opposed the form of judgment and writ proposed by the School District Associations and again requested the trial court adopt a judgment and writ reflecting the exact wording of the trial court's ruling.

The trial court signed and entered the judgment and issued the peremptory writ proposed by the School District Associations.

On appeal, the Charter Association argues the judgment of the trial court should be reversed because the State Board had authority to adopt section 11969.3(d)(2)(B), (C) and (D), the provisions of those regulations are not inconsistent with the Education Code, and specifically that there is a reasonable meaning for a charter school's "attendance area" as used by the regulations. According to the Charter Association, such meaning can be gleaned from the State Board's final statement of reasons for the regulation.

The School District Associations respond that the trial court correctly found an attendance area waiver, as required by Regulations, section 11969.3(d)(2)(B), (C), and (D), "is nonsensical." The School District Associations, however, go on to argue with respect to those sections that (1) "no statute binds any charter school to an existing site"; (2) "no statute grants authority to the [State] Board to control school districts' decisions allocating facilities"; (3) "no statute grants authority to the [State] Board to exempt relocated charter schools from their obligation to reimburse for over-allocated space"; and (4) "subdivision (d) of section 11969.3 is also inconsistent with section 47614 in that it frustrates school districts' ability to meeting [*sic*] their obligations to share facilities equally and to provide facilities in conditions reasonably equivalent." (Capitalization altered.)

The School District Association obtained a judgment vacating Regulations, section 11969.3(d)(1), (2)(A), (B), (C) and (D) in their entirety upon a representation to the trial court that the only issues presented by such regulations were whether they improperly gave conversion charter schools an unqualified right to remain at the converted school site in perpetuity and improperly prevented school districts from changing attendance areas. If the School District Associations had wanted to challenge on appeal the limitation of overallocated space reimbursement in section 11969.3(d)(2)(D) or argue

the regulation frustrated school districts' ability to meet their obligation to share fairly facilities in conditions reasonably equivalent under section 47614, the School District Associations should have stipulated to the entry of the judgment and writ in the form proposed by the State defendants and the Charter Association. Then they could have included their challenges in their appeal of the portions of the regulations upheld by the trial court. We will not now allow the School District Associations to obtain review of issues beyond their challenges to the portion of the regulation imposing limitations on the relocation of conversion charter schools. In any event, we reject those issues for the same reasons as we expressed with respect to section 11969.3(d)(1) and (2)(A), *ante*. We turn now to consideration of that portion of the regulation requiring attendance area waivers.

The trial court premised its rejection of Regulations, section 11969.3(d)(2)(B), (C) and (D) on its agreement with the School District Associations that the concept of attendance areas is inapplicable to charter schools. We disagree.

 Regulations, section 11969.3(d)(2)(B) and (C) prohibit a school district from changing a conversion charter school's "attendance area" unless the school district first secures an appropriate waiver from the State Board. Where a school district has decided to change a charter school's attendance area under section 11969.3(d)(2)(B) and (C) and the district's decision falls between November 1 and June 30, section 11969.3(d)(2)(D) limits the school district's entitlement to reimbursement for overallocated space in the next fiscal year.

The State Board's rationale for these regulatory provisions can be discerned in its final statement of reasons, its addendum to final statement of reasons, and in its responses to comments on the proposed regulations. We begin, however, with the statutory context for the State Board's statements.

 When a district school converts to a charter school, it has a defined attendance area as a district school. Students within that "former attendance area" are entitled to an ongoing admission preference at the charter school (§ 47605, subd. (d)(1)) if they wish to attend, but students may not be forced to attend the charter school (§ 47605, subd. (f)). They may switch to attending another district school. Thus, from the point in time when the district school converts to a charter school and on, the school district and the charter school are in a vigorous competition for the students residing within the former attendance area of the charter school. (See § 47601, subd. (g).)

In both its final statement of reasons and in its addendum to final statement of reasons for the facilities regulations, the State Board noted Regulations,

section 11969.3, subdivision (d)(2) would allow "changes of attendance areas" of conversion charter schools "if waivers of the identified provisions are secured first." "Also, if the attendance areas of this type of school [are] changed after the school has already submitted its facilities request (i.e., between November and June) to be effective the following year, the school is provided a one-year exemption from the requirement to reimburse the district for over-allocated space. *Since any reduction in ADA may have resulted from the attendance area change made by the school district.*" (Italics added.)

A similar concern for the impact of school district decisions regarding attendance areas is further reflected in the State Board's response to a comment requesting regulatory language that would ensure a charter school was not "penalized" *"for declining enrollment due to a district's decisions (i.e., boundary change or traveling student pattern changes that are determined by the sponsoring district).*" (Italics added.) The State Board replied that amendments to the regulations "address this topic in part. Prior to altering the attendance area of a conversion charter school, a district would need to obtain a waiver of the statutory provisions binding the school to the attendance area. Through the waiver process, modification of the attendance area of a conversion charter school would be subject to review by the State Board."

Responding to an objection that "the provision establishing a prerequisite to changing a conversion charter school's attendance area is in conflict with statute," the State Board made the following comments: "Although generally requiring a charter school to admit all pupils who wish to attend, . . . Section 47605[, subdivision] (d)(1), by its own terms, establishes an exception for conversion charter schools, requiring them to give admission preference to pupils who reside within the school's 'former attendance area' (prior to conversion to charter status). The statutory obligation is ongoing, unless waived. Therefore, a waiver is essential if the attendance area of the school is to be changed and consequently impact the charter school's utilization of facilities."

In another response to objections, the State Board stated: "Attendance areas are not moot with regard to conversion charter schools as asserted by commenters. . . . Section 47605[, subdivision] (d)(1) requires that a conversion charter school give admission preference to pupils who reside within the former attendance area of the school. The requirement is ongoing (unless waived), regardless of whether the school is relocated. Similarly, . . . Sections 52055.5, 52055.55 or 52055.650 envision essentially the same students continuing to be served at the school site that is the subject of the conversion. Thus, the regulatory provision requiring a waiver is essential to harmonizing . . . Section 47614 to the other provisions of law."

After reviewing these comments by the State Board and considering the statutory context previously described, we believe the reference to the conversion charter school's "attendance area" in Regulations, section 11969.3(d)(2)(B), (C) and (D) has a discernible meaning.

■ A conversion charter school has a "former attendance area" for purposes of student admission preference. Such "former attendance area" does not change. It is always the former attendance area. But despite the fact that a conversion charter school must otherwise admit students without reference to their place of residence, a conversion charter school also still retains a current "attendance area" in the colloquial sense of the local area surrounding its facilities from which it would naturally draw students. Typically, such attendance area for a conversion school still at its converted school site will be the same as its former attendance area. However, a school district may change the charter school's current attendance area by relocating that school or redrawing its own school boundaries in ways that impact the charter school. That is, a district's change of school boundaries in the charter school's former attendance area or current neighborhood would alter the district schools that students in the local area of the conversion charter school may attend. This change in options may result in a decline in enrollment, a reduction in ADA, by in-district students at the conversion charter school impacting the charter school's facilities request, as foreseen by the State Board. While the school district draws students away from the charter school, the conversion charter school must still maintain an admission preference for all the students in its former attendance area. The State Board could reasonably conclude the potential for abuse, instead of appropriate competition, in this context justified its oversight through the mechanism of requiring an appropriate waiver before a conversion charter school's attendance area could be changed by a school district. The State Board has the authority for such regulatory oversight in section 33031 and through its ability to implement and "fill up" the gaps of section 47614.

We conclude the trial court erred in invalidating Regulations, section 11969.3(d)(2)(B), (C) and (D). We shall reverse that portion of the judgment.

## DISPOSITION

The portion of the judgment concluding California Code of Regulations, title 5, section 11969.3, subdivision (d), subparagraphs (1), (2)(A), (2)(B), (C) and (D) are invalid is reversed and the trial court is directed to vacate its peremptory writ of mandamus. In all other respects, the judgment is affirmed.

Costs on appeal are awarded to the State Board of Education, Jack O'Connell in his capacity as the California State Superintendent of Public Instruction, the State Department of Education, and the California Charter Schools Association. (Cal. Rules of Court, rule 8.278(a)(3).)

Nicholson, Acting P. J., and Robie, J., concurring.

The petition of plaintiffs and appellants for review by the Supreme Court was denied April 13, 2011, S190488. Cantil-Sakauye, C. J., did not participate therein.