Filed 10/18/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MT. DIABLO UNIFIED SCHOOL DISTRICT, | A158195 |
| Plaintiff and Respondent, | |
| v. | (Contra Costa County Super. Ct. No. MSC15-00574) |
| CLAYTON VALLEY CHARTER HIGH SCHOOL, | |
| Defendant and Appellant. | |
| CLAYTON VALLEY CHARTER HIGH SCHOOL, | A158202 |
| Plaintiff and Appellant, | |
| v. | (Contra Costa County Super. Ct. No. MSN16-1356) |
| MT. DIABLO UNIFIED SCHOOL DISTRICT, | ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Respondent. | |

THE COURT:

It is ordered that the opinion filed herein on October 1, 2021, be modified as follows:

On page 18, line 7, after the sentence ending with "per-square-foot charge," add as footnote 10 the following footnote, which will require renumbering all subsequent footnotes:

> [10] As set forth at pages 8–9, *ante*, the charter school in this case paid approximately 99 percent of the ongoing operations and maintenance costs incurred at its facility in the school years at issue. We

do not address and express no opinion on how costs should be apportioned for a hypothetical charter school that pays only a portion, less than substantially all, of the ongoing operations and maintenance costs at its facility.

There is no change in the judgment.

The petition for rehearing is denied.


Dated: October 18, 2021             _____ P. J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial judge: | Honorable Steven Austin |
| Counsel for appellant Clayton Valley Charter High School: | YOUNG, MINNEY & CORR, LLP<br>Paul C. Minney<br>Kevin M. Troy<br>Kaela M. Haydu |
| Counsel for respondent Mt. Diablo Unified School District:<br><br>Counsel for amicus curiae on behalf of respondent: | BURKE, WILLIAMS & SORENSEN, LLP<br>John R. Yeh<br><br>FAGEN FRIEDMAN & FULFROST, LLP<br>Elizabeth B. Mori<br>for Association of California School<br>Administrators and California School Boards<br>Association Education Legal Alliance<br><br>Julie Ashby Umansky<br>Phillipa L. Altmann<br>Michelle Lynch<br>for California Charter Schools Association |

Filed 10/1/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MT. DIABLO UNIFIED SCHOOL DISTRICT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CLAYTON VALLEY CHARTER HIGH SCHOOL,<br><br>    Defendant and Appellant. | A158195<br><br>(Contra Costa County<br>Super. Ct. No. MSC15-00574) |
| CLAYTON VALLEY CHARTER HIGH SCHOOL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MT. DIABLO UNIFIED SCHOOL DISTRICT,<br><br>    Defendant and Respondent. | A158202<br><br>(Contra Costa County<br>Super. Ct. No. MSN16-1356) |

Clayton Valley Charter High School (the charter school) appeals from a judgment resolving a dispute with Mt. Diablo Unified School District (the district) concerning the "facilities costs" for which the district may properly charge the charter school. Under regulations adopted by the State Board of Education (the state board), charter schools are responsible for ongoing operations and maintenance at facilities they use; school districts are responsible for major maintenance and capital improvements; and a district

1

may charge a charter school a pro rata share of its "facilities costs." (Cal. Code Regs., tit. 5,[1] §§ 11969.4, 11969.7.)

The regulations require a district to tabulate certain districtwide "facilities costs" and derive a per-square-foot amount to charge charter schools in the district. A district may include in "facilities costs" funds spent on "plant maintenance and operations" and funds contributed to specified accounts, such as its ongoing and major maintenance account (OMM account), but may *not* include "any costs that are paid by the charter school, including . . . costs associated with ongoing operations and maintenance." (§ 11969.7.) The parties here originally disputed whether the district may include in chargeable "facilities costs" general fund revenues contributed by the district to its OMM account and disbursed from that account to pay costs for "maintenance." For the first year at issue, the charter school contended that its pro rata share of facilities costs, excluding maintenance costs paid with funds from the OMM account, was $27,000; the district's calculations, including these costs, yielded a pro rata share of $309,000.[2] The difference between these two was the dispute raised by the pleadings and briefed by the parties; however, the trial court sua sponte adopted an unprecedented view of the regulation advanced by neither party. It held that neither the costs of maintenance nor of operations should be excluded, so that "facilities costs" includes *all* districtwide costs paid by a district for plant maintenance and operations, even if the funds did not pass through the OMM account, and even if a charter school itself pays the costs of operations and maintenance at its own site. The trial court's unprecedented view, now defended by the district and amici curiae, would

---

[1] All undesignated section references are to title 5 of the California Code of Regulations.

[2] All dollar amounts in this opinion are rounded to the nearest $1,000.

2

require the charter school in this case to pay all operations and maintenance costs of its own *plus* a share of such costs for all schools in the district, which would raise the charter school's pro rata share for the first year at issue to more than $1.1 million.

While the text of the regulations is ambiguous and, in part, self-contradictory, the regulatory history and the statutory scheme, as well as the common understanding of all parties prior to the trial court's unsolicited ruling, make clear that the state board did not intend such a result. We conclude that a district must exclude from the facilities costs it charges a charter school all costs of both operations and ongoing maintenance if the charter school pays those costs for its own premises. We shall therefore reverse the judgment.

**Factual and Procedural History**

1. *Statutory and Regulatory History*

   a. *The Governing Statute*

"The Legislature adopted the Charter Schools Act of 1992 ([Ed. Code,] § 47600 et seq. . . .) to 'provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure . . . .' " (*California School Boards Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 540 (*CSBA*), quoting Ed. Code, § 47601.) Section 47614, as enacted in 1998, required a district to "permit a charter school to use, at no charge, [certain unused] facilities . . . provided the charter school shall be responsible for reasonable maintenance of those facilities." (Stats. 1998, ch. 34, § 15.)

In 2000, the voters "changed this limited obligation of a school district" by adopting Proposition 39, which "expressed the intent 'that public school facilities should be *shared* fairly among all public school pupils, including

3

those in charter schools.' " (*CSBA, supra,* 191 Cal.App.4th at p. 41, quoting Ed. Code, § 47614, subd. (a).) Section 47614 now requires a district to "make available, to each charter school operating in the . . . district," facilities sufficient to accommodate the school's students "in conditions reasonably equivalent to those in . . . other public schools of the district." (Ed. Code, § 47614, subd. (b).) The facilities shall be "furnished, and equipped, and shall remain the property of the school district." (*Ibid.*) The district "may charge the charter school a pro rata share (based on the ratio of space allocated . . . to the charter school divided by the total space of the district) of those school district facilities costs which the school district pays for with unrestricted general fund revenues"; the school "shall not be otherwise charged for use of the facilities." (*Id.*, subd. (b)(1).) The statute directs the Department of Education to propose, and authorizes the state board to adopt, implementing regulations—including one to define such terms as "facilities costs." (*Id.*, subd. (b)(6).)

   b. *The Original 2002 Regulations*

  In 2002, the state board adopted implementing regulations. (See former §§ 11969.1–11969.10.) Section 11969.4, titled "Operations and Maintenance," set forth these basic principles in terms that remain in effect: "The ongoing operations and maintenance of facilities and furnishings and equipment is the responsibility of the charter school. . . . [T]he replacement of furnishings and equipment supplied by the school district in accordance with [its] schedules and practices, shall remain the responsibility of the school district. . . ." (§ 11969.4.)

  Although not explicitly defining "facilities costs," the original version of section 11969.7, titled "Charges for Facilities Costs," specified costs to be included, and provided: "The pro rata share amount shall not exceed (1) a per-square-foot amount equal to those school district facilities costs that the

4

school district pays for with unrestricted general fund revenues, as described [in] the California School Accounting Manual [(accounting manual)], divided by the total space of the school district times (2) the amount of space allocated by the school district to the charter school. [¶] (a) *For purposes of this section, facilities costs includes those costs associated with facilities acquisition and construction and facilities rents and leases*, as defined [in the accounting manual]. For purposes of this section, facilities costs also includes *the contribution from unrestricted general fund revenues to the school district deferred maintenance fund,* costs from unrestricted general fund revenues for projects eligible for funding but not funded from the deferred maintenance fund, and costs from unrestricted general fund revenues for replacement of furnishings and equipment according to school district schedules and practices." (Former § 11969.7, italics added.) Another provision, to which we refer as the "equal-application requirement," stated that the per-square-foot charge must be "applied equally by the school district to all charter schools that receive facilities under this article." (*Id.*, subd. (e)).

Section 11969.9 created a process for charter schools and districts to negotiate agreements about the use of and payment for facilities. (Former § 11969.9.) That provision also authorized the parties to "negotiate separate agreements and/or reimbursement arrangements for specific *services not considered part of facilities costs* as defined in Section 11969.7. Such services may *include . . .* the use of additional space and *operations, maintenance, and security services*." (Former § 11969.9, subd. (j), italics added.) The regulations thus identified "operations, maintenance, and security services" as "services *not* considered part of facilities costs." (*Ibid.*, italics added.)

The statement of reasons for the new regulations explained that they allocate costs between charter schools and districts in a manner that parallels

5

the allocation of responsibilities: "This section [11969.4] specifies that the charter school is responsible for the ongoing operation and maintenance of the facility and of the furnishings and equipment it uses. The school district is responsible for items funded through the deferred maintenance program (such as a new roof) and the replacement of furnishings and equipment supplied by [it]. The responsibilities outlined in this section are parallel to the definition of facilities costs in section 11969.[7].[3] Section 11969.[7] defines what is considered a facilities cost for purposes of developing a charge to be imposed on the charter school: the items considered part of a school district's facilities costs are also the school district['s] responsibility; the items excluded from facilities costs are the charter school's responsibility."

        c. *The 2008 Amendments*

In 2007, the Department of Education reviewed the regulations "with the assistance of a workgroup . . . including charter schools, school administrators, school boards, and teachers." (*CSBA, supra,* 191 Cal.App.4th at p. 542.) The department proposed several amendments, which the state board adopted in 2008. (*Ibid.*) The relevant regulations have not been amended since.

The 2008 amendments altered section 11969.7 and added a definition of "facilities costs" to section 11969.2.[4] That section defines "facilities costs" as

---

[3] The statement says, "section 11969.6," but this is an obvious typographical error: section 11969.7 addresses facilities costs; section 11969.6 concerns an unrelated topic.

[4] The state board also made immaterial changes to section 11969.4 and to section 11969.9. The change to section 11969.9 deleted the paragraph noting that districts and schools may negotiate separate agreements regarding services outside the definition of "facilities costs." The state board deleted this provision "because [it was] permissive and unnecessary." With the inclusion of operation and maintenance costs in the definition of facilities costs for which a charter school receiving those services from a district pays a pro rata share, as

6

"activities concerned with keeping the physical plant open, comfortable. and safe for use and keeping the grounds, buildings, and equipment in working condition and a satisfactory state of repair. These include the activities of maintaining safety in buildings, on the grounds, and in the vicinity of schools. This includes *plant maintenance and operations*, facilities acquisition and construction, and facilities rents and leases." (§ 11969.2, subd. (h), italics added.)

Section 11969.7, subdivision (a) was amended to read: "For purposes of this section, facilities costs that the school district pays with unrestricted general fund revenues includes those costs associated with plant maintenance and operations, facilities acquisition and construction, and facilities rents and leases, as defined in section 11969.2(h). For purposes of this section, facilities costs also includes: [¶] (1) contributions from unrestricted general fund revenues to the school district's Ongoing and Major Maintenance Account [citation], Routine Restricted Maintenance Account [citation], and/or deferred maintenance fund, [¶] (2) costs paid from unrestricted general fund revenues for projects eligible for funding but not funded from the deferred maintenance fund, and [¶] (3) costs paid from unrestricted general fund revenue for replacement of facilities-related furnishings and equipment, that have not been included in paragraphs (1) and (2), according to school district schedules and practices." And the state board added an entirely new paragraph (the "exclusion paragraph") to section 11969.7: "For purposes of this subdivision, facilities costs do not include any costs that are paid by the charter school, including, but not limited to, costs associated with ongoing operations and maintenance and the costs of any tangible items adjusted in keeping with a

explained in text, separate agreements covering those costs became unnecessary.

7

customary depreciation schedule for each item." Thus, while the definition of facilities costs in section 11969.2 was expanded to include the cost of plant maintenance and operations, those costs were excluded if paid by the charter school.

2. *Case-specific Facts and Proceedings*

The charter school in this case was originally a traditional public high school operated by the district. It became a "conversion" charter school (Ed. Code, § 47605) in 2012 after teachers signed a petition to that end, which the district rejected but the county board of education approved.

The accounting manual distinguishes plant maintenance and operations, for which the charter school in this case pays, with a few exceptions,[5] from deferred or major maintenance, for which the district in this case pays. The latter includes "major repair or replacement of plumbing, heating, air-conditioning, electrical, roofing, and floor systems," (Ed. Code, § 17582) asbestos or lead remediation (*ibid.*), and any "capital project that extends the life and the value of a capital asset," such as "acquiring land and buildings, remodeling buildings, constructing buildings and additions to buildings, initially installing or extending service systems and other built-in equipment, and improving sites."

In the school years at issue (2013–2014 through 2016–2017), the charter school paid on average over $1.6 million a year in ongoing operations and maintenance costs, while the district performed occasional maintenance at the

---

[5] The district performs maintenance on request in certain specific situations, such as "the maintenance of the heating, ventilation, and air conditioning . . . system and boilers pursuant to the district's request to maintain these systems, troubleshooting the fire alarm and intercom systems . . ., answering general systems questions (i.e., which valve or breaker controls an area), major maintenance (i.e., major leaks, opening walls, etc.), and . . . rare maintenance emergencies . . . (i.e., a gas leak)."

site costing $13,000 to $31,000 per year. For the charter school's first year of operation (2012–2013), the parties negotiated an agreement on the dollar amount but could not agree on a method of calculating the charter school's pro rata share of the district's facilities costs. The agreed amount was $160,000. For the subsequent four years at issue in the litigation, the district demanded increasing sums while the charter school paid $160,000 each year pending resolution of the dispute.

In calculating its demands, the district excluded from facilities costs all general fund revenues devoted directly to "operations" or "maintenance." It also excluded funds disbursed from the OMM account to pay for "operations" but it included funds disbursed from the OMM account for "maintenance." The charter school contended that the exclusion paragraph requires the district to exclude such funds from facilities costs, but the district insisted that all expenditures from its OMM account for "maintenance" were for "major maintenance," rather than "ongoing/routine maintenance" for which the charter school is responsible.

Each party eventually filed an action seeking a determination of the amounts due.[6] After the two cases were deemed related, the parties, upon stipulation, filed a single set of briefs contending, respectively, that maintenance costs paid from the OMM account should or should not be

---

[6] In 2015, the district filed an action to recover the difference between the charter school's $160,000 payments for the 2013–2014 and 2014–2015 school years and the sums the district claimed for those years ($309,000 and $313,000). In 2016 the charter school filed an action to bar the district from conditioning its offer of facilities for 2016–2017 on the charter school's payment of the sums allegedly due. The district filed a cross-petition to compel the charter school to pay the difference between the $160,000 that it paid in 2015–2016 and the $391,000 that the district claimed, and to pay $484,000 claimed for the coming 2016–2017 school year.

included in facilities costs to properly calculate the pro rata share for which the charter school was responsible. The court's tentative ruling, however, expressed a novel view suggested by neither party: that a district may include in its facilities costs *all* districtwide plant maintenance and operations costs, regardless of whether the charter school paid its own maintenance and operations costs, whether the costs were for "operations" or "maintenance," or whether the funds passed through the district's OMM account.

The court tentatively ruled that the exclusion paragraph requires only that the district subtract the amount spent by the charter school on its own ongoing operations and maintenance from the district's total facilities costs used to calculate the charter school's pro rata share of those costs. After supplemental briefing, the court issued an order reaching a similar outcome, but based on a revised reading of the exclusion paragraph. That paragraph, it now held, does not require *any* deduction or offset for operations and maintenance costs paid by a charter school. Instead, it is merely a "poorly worded warning" to a district not to include in its facilities costs any specific costs paid by the school.

The court issued a judgment in the district's favor and the charter school filed a timely notice of appeal.

## Discussion

This court reviews de novo the interpretation of statutes and regulations and their application to the facts, which in this case are undisputed. (*Tanner v. Public Employees' Retirement System* (2016) 248 Cal.App.4th 743, 753.)

1. *Section 11969.7 Requires a District to Exclude Plant Maintenance and Operations Costs From Its Facilities Costs in Calculating the Pro Rata Share of a Charter School that Pays for Its Own Operations and Maintenance.*

The fundamental question on appeal turns on the meaning of the exclusion paragraph added to section 11969.7, subdivision (a) in 2008. As noted

above, this paragraph reads: "For purposes of this subdivision, facilities costs do not include any costs that are paid by the charter school, including, but not limited to, costs associated with ongoing operations and maintenance and the costs of any tangible items adjusted in keeping with a customary depreciation schedule for each item." The dispositive question is whether this provision requires a district to exclude from its districtwide facilities costs "any [*category of*] costs that are paid by the charter school," as the charter school contends, or only "any [*specific*] costs that are paid by the charter school," as the court held. In other words, if a district pays districtwide plant maintenance and operations costs of $900,000, and a charter school within the district pays $100,000 for its own ongoing operations and maintenance, does the exclusion paragraph require the district to exclude the $900,000 from its tally of "facilities costs" when calculating that school's pro rata share, or does it merely "warn" the district not to include in its facilities costs the $100,000 paid by the school itself?

As the charter school contends, the court should avoid "an interpretation which renders any language mere surplusage." (*Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021.) Section 11969.7 has always stated that a school's pro rata share is based on "facilities costs *that the school district pays for* with unrestricted revenues from [its] general fund." (Italics added.) The statute also refers to "facilities costs which the school district pays for." (Ed. Code, § 47614, subd. (b)(1).) To treat the exclusion paragraph added in 2008 as merely a "warning" that "costs that the school district pays for" does not include "costs that the charter school pays for" is to render the exclusion paragraph redundant, depriving it of any meaningful function. Only if construed to require exclusion of any category of costs that are paid by the charter school does the language add anything to the balance of the regulation.

11

The district never refutes this argument, but it adopts the trial court's view that excluding the entire category of costs paid by the charter school would render meaningless the inclusion of "plant maintenance and operations costs" in the definition of "facilities costs." In rejecting the charter school's approach, the trial court's order poses this rhetorical question: "If the regulations mandate that every charter school has the responsibility for its operations and maintenance, and [if] the regulations intend for the district to exclude this category when calculating the pro rata share, why do the regulations define [a] district's facilities costs to include plant maintenance and operations?" The court evidently found this question unanswerable, but the answer is simple and straightforward. While the regulations make operations and maintenance the "responsibility" of each charter school, they do not require each charter school to fulfill that responsibility by directly employing maintenance workers or contracting with third parties for the performance of those services. A charter school may fulfill its responsibility for ongoing operations and maintenance either by paying employees and contractors to provide such services, as the school in this case does, or by contracting with its district to provide those services. The charter school in this case offered uncontradicted evidence—including 28 agreements between charter schools and other school districts—that many charter schools contract with their district to provide routine operations and maintenance. The practice is apparently common in cases of "colocation," in which a charter school shares a facility with a district-run school. (See *New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 847.)

That is the reason for which operations and maintenance costs are included in the definition of "facilities costs" in section 11969.2 but excluded from "facilities costs" by the exclusion paragraph in section 11969.7 for schools

12

that pay that category of costs directly. The state board added "plant maintenance and operations" costs to the definition of "facilities costs" to enable a district to obtain compensation for such services by way of a charter school's pro rata share in those cases in which the district provides such services to the school. But the concurrently added exclusion paragraph requires a district to exclude its districtwide plant maintenance and operations costs from its "facilities costs" when calculating the pro rata share of a school that pays for such services itself. Otherwise, the school will pay for the services twice, and the district will receive reimbursement for services it did not provide—an outcome inconsistent not only with common sense but with the mandate that public school facilities be "shared fairly among all public school pupils, including those in charter schools" (Ed. Code, § 47614, subd. (a)) and with the statement in the 2008 rulemaking file that the pro rata charge ensures that a charter school's use of a facility "is cost-neutral to the school district's general fund."[7]

The district also contends that the charter school's interpretation is inconsistent with the equal-application requirement in section 11769.7, subdivision (e), which provides that the per-square-foot facilities charge "shall be applied equally . . . to all charter schools that receive facilities." (§ 11969.7, subd. (e)) A school district would violate that provision, the district argues, if it used one amount of "facilities costs" to calculate the per-square-foot charge applicable to a charter school that pays its own operations and maintenance

---

[7] Moreover, as illustrated by a hypothetical example in the charter school's brief not disputed by the district or its amici, if operation and maintenance costs were not excluded from facilities costs for charter schools paying those costs directly, a district would receive a windfall whenever a charter school opted to hire its own employees or to contract with a third party to perform those services.

costs but used a different amount of "facilities costs" to calculate the per-square-foot charge applicable to schools that do not pay such costs.

The apparent conflict between the exclusion paragraph and the equal-application requirement is resolved by reference to the regulatory history. (See *Department of Indus. Relations v. Occupational Safety & Health Appeals Bd.* (2018) 26 Cal.App.5th 93, 101.) Under the initial 2002 regulations it was clear that districts could not include plant maintenance and operations costs in "facilities costs." Section 11969.7, which listed the costs comprised in "facilities costs," did not include ongoing operations and maintenance or plant maintenance and operations. Rather, section 11969.9, which authorized districts and schools to enter separate reimbursement agreements "for specific services not considered part of facilities costs as defined in Section 11969.7," specified that "such services may include . . . operations, maintenance, and security services." (Former § 11969.9, subd. (j).) The statement of reasons explained that under section 11969.4, a charter school "is responsible for the ongoing operation and maintenance of the facility and the furnishings and equipment it uses," while the district "is responsible for items funded through the deferred maintenance program (such as a new roof) and the replacement of furnishings and equipment supplied by [it]." Those responsibilities, it added, "are parallel to the definition of facilities costs in section 11969.[7]." The distinction made sense: because a district is not responsible for operations and maintenance at a charter school that pays such costs itself, such a district should not allocate to such a school a share of the costs that the district incurs to operate and maintain *other* schools. Under the original regulations, if a district provided maintenance and operations services to a particular charter school, those parties could negotiate a separate agreement for reimbursement. (Former § 11969.9, subd. (j).)

14

There is no indication in the extensive rulemaking file or elsewhere that the state board intended the 2008 amendments to alter the obligation of charter schools that pay their own operations and maintenance costs. As to the relevant portion of section 11969.7, the 2008 statement of reasons states only that "[t]he opening paragraph is technically restructured to eliminate the permissive phrasing and to provide a lead-in sentence for the subdivisions that follow"; the "reference to the [accounting manual] is updated, though substantively it is the same"; and "a paragraph is added concerning the exclusion of costs paid by the charter school, as well as the value of tangible items paid for by the charter school (which are to be depreciated)." Charter-school representatives participated in the workgroup that helped generate the amendments (*CSBA*, *supra*, 191 Cal.App.4th at p. 542), and the rulemaking file includes public comments from school districts, charter schools, and several interested organizations. Nonetheless, the file contains no indication that anyone intended or understood that the amendments to section 11969.7 would substantially increase the pro rata share owed by a charter school that pays its own operations and maintenance costs,

In its briefing, the district implicitly agreed that the 2008 amendments were not intended to change the obligation of charter schools that pay their own operating and maintenance costs. However, the district incorrectly asserted that "[t]he plain language of the original 200[2][8] regulations allowed school districts to include 'plant maintenance and operations' costs [in] the determination of districtwide facilities costs," supporting its contention that charter schools paying for their own maintenance and operations had always

---

[8] The district incorrectly refers to the original regulations as the "2003 regulations," but the regulations were in fact adopted in 2002, and we refer to them as such.

been obligated to pay a pro rata share of the maintenance and operations costs paid by the district for other schools. At oral argument, the district conceded that this was a misstatement, and that in fact the 2002 regulations expressly excluded operations and maintenance costs from the category of "facilities costs." (Former § 11969.9, subd. (j), italics added.) Thus, the recognition that the 2008 amendments did not change the charter schools' obligations confirms that those costs are not included in facilities costs payable by a charter school that pays for its own maintenance and operations. The district also conceded that under the trial court's interpretation the 2008 amendments significantly increased the financial obligations of charter schools that pay for their own operations and maintenance, but it was unable to identify anything in the regulatory history indicating that the amendments were intended to have such an effect.

The district cites another statement in the 2008 statement of reasons to support the general proposition that the state board did not intend that a school district deduct "entire subcategories" of costs from facilities costs when calculating a charter school's pro rata share. That statement explained that "a paragraph is added [to section 11969.7] concerning the exclusion of costs paid by the charter school, as well as the value of tangible items paid for by the charter school (which are to be depreciated). For example, if the charter school were to pay for resurfacing of the play area, the depreciated value of the resurfacing would be annually deducted from facilities costs." That hypothetical example, however, concerns the exclusion paragraph's reference to costs of tangible items, not the reference to the costs of ongoing operations and maintenance, the only matter in dispute.[9]

_____

[9] The district asserts that the "play area" hypothetical reflects that entire subcategories are not to be deducted from facilities costs because the hypothetical district would deduct the depreciated value of the play area "*after*

16

The district also cites a response in the 2002 statement of reasons to a public comment on the draft regulations: A commenter had "proposed an amendment stating that charges imposed on charter schools should be applied equally to all charter schools at a particular site, not to all charter schools across the school district . . . because district costs can vary among sites," and the response stated, "The statute requires the calculation to be performed school district–wide, and does not refer to a site-by-site determination of facility costs. Also, the [proposal] would result in unnecessary administrative costs." While this response did say that facilities costs must be calculated on a districtwide basis, the proposal that it rejected would have required a district to calculate *all* facilities costs site by site, i.e., to calculate "facilities acquisition and construction and facilities rents and leases" costs for each site, to estimate each site's share of contributions to the deferred maintenance fund, and to tally the costs incurred at each site to replace furnishings or equipment. (Former § 11969.7.) The reference in the statement of reasons to district-wide calculations was to explain why that approach was unacceptable.

That explanation is not inconsistent with the charter school's interpretation of section 11969.7, which entails no such site-by-site calculus. As the charter school correctly reads section 11969.7, the district must calculate a single, districtwide per-square-foot charge to apply to all charter

the charter school's total pro rata share of facilities costs was determined [by] multiplying the per-square-foot amount by the charter school's square footage." But that is not what the statement says. It says that the depreciated value "would be annually deducted *from facilities costs*," not from the school's pro rata share *after* the district's tally of facilities costs is used to calculate that share. In any event, the district clarified at oral argument that it does not contend that the regulations require a district to *deduct* the amount spent by a charter school on its own ongoing operations and maintenance from the district's facilities costs, which is the approach the trial court proposed in its tentative ruling but disavowed in its final order.

schools in the district for which it provides operations and maintenance, and a single, albeit different, districtwide per-square-foot charge for charter schools for which the district does not provide those services. Each charter school that does not directly pay for its own operations and maintenance services will pay the district the same per-square-foot charge, and each school that does directly pay for such services will pay the district the same lesser per-square-foot charge.

While this interpretation of the equal-application provision is to some extent inconsistent with the literal language of the regulation, it nonetheless retains the principle of equal treatment. The equal-application requirement still compels a district to apply the same per-square-foot charge to all charter schools that do not pay for their own operations and maintenance, and to apply the same modified charge to all schools that do. This interpretation gives meaning to both the equal-application requirement and the exclusion paragraph, while the strict, literal reading of the equal-application requirement advocated by the district would render the exclusionary provision meaningless: A district could never exclude from its districtwide facilities costs any costs that are paid by a charter school because doing so would result in the district applying a different per-square-foot charge to the charter school that paid such costs.

This construction is also consistent with the rationale set forth in the 2002 statement of reasons: "the items considered part of a school district's facilities costs are also the school district['s] responsibility; the items excluded from facilities costs are the charter school's responsibility." Nothing in the regulatory history suggests an intent to abandon that rationale by making a charter school reimburse a district for services the district does not provide. Indeed, before this litigation, the district excluded plant maintenance and

18

operations costs from its calculation of facilities costs used to determine the charter school's pro rata share of facility costs. Before the tentative ruling, the district did not claim that it may include such costs. And since that ruling, neither the district nor the amici curiae supporting it has identified any California school district that has included its districtwide maintenance and operations costs in its facilities costs when calculating the pro rata share of a charter school that pays its own operations and maintenance costs.

The opinion in *CSBA, supra*, 191 Cal.App.4th 530, does not support the trial court's interpretation as the district contends. In rejecting one of numerous challenges to the validity of the amended regulations adopted in 2008, the court made the statement on which the district relies: "*The facilities costs that may be charged against the charter school in section 47614 do not supplant the charter school's responsibility for its ongoing maintenance and operations costs*. . . . [A] charter school still has the responsibility for the ongoing operations and maintenance of the facilities, furnishings, and equipment provided by the school district. [Citation.] And although certain subdivisions of section 11969.7 include 'costs associated with plant maintenance and operations[,]' and school district contributions from unrestricted general fund revenues to various specified district maintenance accounts, in the facilities costs used for the calculation of the pro rata share . . . , another provision of section 11969.7 expressly excludes 'any costs that are paid by the charter school, including, but not limited to, costs associated with ongoing operations and maintenance . . . .' [Citation.] Thus, charter schools retain the responsibility for ongoing operations and maintenance and the facilities costs charge is not a substitute for such obligation." (*CSBA, supra*, at p. 561.)

The comment that the pro rata charge does not "supplant" a school's responsibility for operations and maintenance costs was made to refute the contention that the charge for facility costs could not be considered as rent for the purpose of section 47613. That provision increases the supervisorial costs that may be recouped from a charter school if the facilities provided the school are "substantially rent free." A charter school's pro rata share of a district's facilities costs, the court held, can be considered as rent for that purpose, but the imposition of that charge does not eliminate the charter school's responsibility to provide for the ongoing operations and maintenance of its premises. The *CSBA* court did not address the question here, whether a charter school that fulfills its obligation by paying directly the costs of operating and maintaining its premises can also be charged for a portion of districtwide plant maintenance and operations costs. As indicated above, however, the opinion did note that "another provision of section 11969.7 expressly excludes 'any costs that are paid by the charter school, including, but not limited to, costs associated with ongoing operations and maintenance . . . .'" (*CSBA*, *supra*, at p. 561, quoting § 11969.7, subd. (a).) Thus, if anything, *CSBA* supports the conclusion we reach that no such costs may be included in the facilities costs used to calculate the pro rata share of a charter school that pays for its own operations and maintenance.[10]

---

[10] The explanation of the alternative that section 47613 gives to a school district that is the chartering authority for a charter school (not the situation here) to charge that school an increased supervisorial fee rather than a pro rata facilities cost fee brings into focus an argument made by the district's supporting amici. The amici defend the trial court's interpretation of section 11969.7 by arguing that for the first school year in question (2013–2014) such a district could have charged a supervisorial fee of $396,000, reflecting that the $309,000 pro rata charge the district originally sought to impose for that year was neither unfair nor unreasonable. That comparison is essentially irrelevant, but in all events it fails to illustrate the reasonableness of the

2. *Section 11969.7 Requires a District to Exclude from Facilities Costs Any Contributions to its OMM Account that are Ultimately Disbursed to Pay Costs of a Type Paid by the Charter School.*

The trial court's misreading of section 11969.7 overshadowed the parties' original dispute about the OMM account. The district created that account pursuant to section 17070.75 of the Leroy F. Greene School Facilities Act of 1998 (Ed. Code, §§ 17070.10–17079.30) (the 1998 Greene Act), which created "School Facilities Funds" and authorized disbursements to school districts from those funds. (*Id.,* § 17070.40.) Subdivision (a) of section 17070.75 directs the board that allocates such funds to require districts seeking funding to "make all necessary repairs, renewals, and replacements to ensure that a project is at all times maintained in good repair, working order, and condition." Subdivision (b) states that, "to ensure compliance with subdivision (a) and to encourage school districts to maintain all buildings under their control, the board shall require an applicant school district to . . . : [¶] (1) [e]stablish a restricted account . . . for the exclusive purpose of providing moneys for ongoing and major maintenance of school buildings, according the highest priority to funding for the purposes set forth in subdivision (a). . . ."

The original version of section 11969.7 authorized a district to include in its "facilities costs" only general fund revenues contributed to one restricted account: the deferred maintenance fund. The 2008 amendments expanded the definition of "facilities costs" to include contributions to a school district's OMM account, routine restricted maintenance account, and/or deferred maintenance fund. Thus, contributions to the OMM account were added to the list of

_____

pro rata share of facilities costs yielded by the trial court's interpretation of section 11969.7, which is $1.1 million.

The charter school's request for judicial notice of documents designed to show that in subsequent school years the disparity would be even greater is denied as irrelevant.

21

includable costs in section 11969.7 at the same time the exclusion paragraph was added. Because the parties' original dispute involves only contributions to the OMM account,[11] the dispute parallels the question analyzed above: When the state board amended section 11969.7 by both including contributions to the OMM account as facilities costs and adding the exclusion paragraph, did it limit a district's ability to include contributions to the OMM account in its facilities costs? As with plant maintenance and operations costs, we conclude that it did.

Before this litigation, the district acted partly in accord with that view: In calculating facilities costs, it excluded funds disbursed from the OMM account to pay for "operations" but included funds disbursed for "maintenance." As the district stated below, "In recognition of the fact that charter schools are only responsible for 'ongoing operations and maintenance,' " it "deducted from its calculation of districtwide facilities costs" revenues devoted to the accounting manual function codes for maintenance (8100) and operations (8200), and it deducted from its contribution to the OMM account "expenditures under operations (8200)." But it did not deduct expenditures under maintenance (8100) from its OMM account contribution. In short, the district treated funds expended on function 8100 as expenditures for ongoing maintenance for which the charter school was responsible unless the funds passed through the OMM account. In that case, the district counted "maintenance" expenditures as "facilities costs."

---

[11] Confusingly, district documents and witnesses refer to the OMM account as an "RRM account" (routine restricted maintenance account), but this is a nomenclatural holdover. The district's Director of Fiscal Services testified that the district never had a routine restricted maintenance account, and that " 'RRM' is just a shorthand for 'OMM account.' "

In its brief below—filed before the court issued its tentative ruling—the district sought to justify its approach as follows: "The district's . . . contribution to [the OMM account],[12] as its name implies, is intended to pay for major maintenance, repair, and replacement require[d] under . . . section 17070.75(b); in other words, to 'extend the life and value of a capital asset.' By contrast, ongoing/routine maintenance under [the accounting manual] function 8100 is intended to 'keep the physical plant and grounds open, clean, comfortable, and in working condition and a satisfactory state of repair.' . . . [The accounting manual] specifically directs . . . '[d]o not use function 8100 for a capital project that extends the life and the value of a capital asset.' " The district added that, "as required by law, [it] incurs expenditures out of the [OMM account] contribution 'to make all necessary repairs, renewals, and replacements' required under . . . section 17070.75(a) (i.e., major maintenance), as opposed to the ongoing maintenance that is the responsibility of the charter school under [section] 11969.4."

The exclusion paragraph applies to *all* costs listed in section 11969.7, with no basis to differentiate between expenditures from the OMM account for "operations" and those for "maintenance." The charter school refuted the district's claim that all expenditures from the OMM account were for major rather than ongoing maintenance by showing that the district labeled 90 percent of such expenditures with function code 8100 (maintenance), rather than 8500 (facilities acquisition and construction). By the district's own account, the charter school pointed out, that label indicates that these expenditures were for ongoing maintenance, not capital projects.

---

[12] The quoted passage in the district's brief referred to the district's "RRM contribution to Resource 8150," but as indicated in footnote 11 above, Resource 8150 is the OMM account, to which district employees habitually refer as the "RRM Account."

Given its interpretation of the exclusion paragraph, the trial court did not address this narrower question. As a result, the parties rehash their arguments below. The district insists that expenditures from its OMM account are by definition for major maintenance, but without refuting the charter school's contrary factual showing below. The district's unsupported insistence is unpersuasive. Its reliance on the name of the account proves nothing since the name is "ongoing and major maintenance account." The district's assertion that any contribution to that account, "*as its name implies*, was intended to pay for major maintenance, repair, and replacement" simply ignores half the name. As the charter school asserts in reply, contributions made to an OMM account "may be used for either 'ongoing' maintenance or 'major' maintenance."

The text of section 17070.75 confirms the broader scope of the account. Subdivision (a) of section 17070.75 requires a district to "make all necessary repairs, renewals, and replacements to ensure that a project is at all times maintained in good repair, working order, and condition." Subdivision (b) requires it to create an account "for the exclusive purpose of providing moneys for ongoing and major maintenance of school buildings." As the charter school pointed out below, the mandate that facilities be "maintained in good repair, working order, and condition" (*id.*, subd. (a)) echoes the accounting manual definition of function code 8100 (maintenance). That function code covers expenditures "to keep the [facility] open, clean, comfortable, and in working condition and a satisfactory state of repair"—a definition the district has acknowledged to encompass ongoing maintenance.

In sum, the district's claim that all expenditures from its OMM account must necessarily have been for major maintenance is unsupported, and the charter school's showing that 90 percent of the district's expenditures from

24

that account were for ongoing maintenance is unrebutted. Since under its view of the exclusion paragraph the trial court made no findings about the percentage of funds from the OMM account expended for ongoing maintenance as distinguished from capital improvements, we cannot resolve the controversy over which the litigation was instituted, and the matter must be remanded for further proceedings to resolve that dispute.[13]

## Disposition

The judgment is reversed and the cases are remanded for further proceedings consistent with this opinion. Clayton Valley Charter High School shall recover its costs on appeal.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
ROSS, J.*

---

[13] The dispute over the OMM account also concerned how the district should treat funds rolled over in the account from one year to another without being spent. The trial court did not address that issue nor do the parties' briefs on appeal, so it too must be addressed on remand.

* Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial judge: | Honorable Steven Austin |
| Counsel for appellant Clayton Valley Charter High School: | YOUNG, MINNEY & CORR, LLP<br>Paul C. Minney<br>Kevin M. Troy<br>Kaela M. Haydu |
| Counsel for respondent Mt. Diablo Unified School District:<br><br>Counsel for amicus curiae on behalf of respondent: | BURKE, WILLIAMS & SORENSEN, LLP<br>John R. Yeh<br><br>FAGEN FRIEDMAN & FULFROST, LLP<br>Elizabeth B. Mori<br>for Association of California School Administrators and California School Boards Association Education Legal Alliance<br><br>Julie Ashby Umansky<br>Phillipa L. Altmann<br>Michelle Lynch<br>for California Charter Schools Association |